**UNITED STATES of America**

v.

**John F. "Duffy" CONLEY, William C. Curtin, Sheila F. Smith, John Francis "Jack" Conley, Thomas "Bud" McGrath, Mark A. Abbott, Thomas Rossi, William Steinhart, Roberta Fleagle, Robin Spratt, Monica C. Kail, William J. Reed, Joanne T. Smith, Kenneth "Ron" Goodwin, Lawrence N. "Neudy" Demino, Sr., Christopher "Chris" Kail, Joseph A. Devita, Frank Garofalo, Thomas D. Ciocco, Michael Sukaly, Phillip M. "Mike" Ferrell, Anestos "Naz" Rodites, and William E. Rusin, Defendants.**

Crim. No. 91–178.

United States District Court,
W.D. Pennsylvania.

Sept. 3, 1993.

Frederick W. Thieman, U.S. Atty. W.D. Pa., James R. Wilson, Paul E. Skirtich, Asst. U.S. Attys., Pittsburgh, PA, for plaintiff.

James Wymard, William Difenderfer, Ellen Viakley, Gary Gerson, Anthony Mariani, Lee Markovitz, Ray Radakovich, Stanley Greenfield, Martha Bailor, Raymond M. Maloney, John Zagari, Foster Stewart, Edward J. Osterman, Carl M. Janavitz, Carmen A. Martucci, Joel Johnston, John Goodrich, Vincent Baginski, Samuel J. Reich, William Acker, Joseph Kanfoush, Michael Foglia, Carl Parise, Caroline Roberto and Gary B. Zimmerman, Pittsburgh, PA, for defendants.

## UNITED STATES v. CONLEY, CR91–178 (W.D.PA): INDEX TO SEPTEMBER 3, 1993 MEMORANDUM OPINION [1]

INTRODUCTION .......................................................... 1124
THE INDICTMENT ....................................................... 1124
  Introduction ........................................................ 1124
  Count One: The Conspiracy........................................... 1126
    The Conspiracy and its Objects.................................... 1126
    Manner and Means of the Conspiracy............................... 1126
    Overt Acts ...................................................... 1128
  Count Two: Illegal Gambling Business ................................ 1128
DISCUSSION ............................................................ 1128
DEFENDANT THOMAS "BUD" MCGRATH'S MOTION TO DISMISS COUNT I... 1128
  Double Jeopardy ..................................................... 1128
  The Statutes ........................................................ 1134
    Prohibition of Illegal Gambling Business, 18 U.S.C. § 1955 ................... 1134
    Laundering of Monetary Instruments, 18 U.S.C. § 1956(a)(1)(A)(i) ............ 1136

[1]. This Index does not constitute part of the Court's Memorandum Opinion and has been provided solely for the convenience of the reader.

Legislative History of 18 U.S.C. § 1956(a)(1)(A)(i) ............................ 1141
  S. 572, 99th Cong., 1st Sess. (1985) ....................................... 1142
  S. 1385, 99th Cong., 1st Sess. (1985) ...................................... 1143
  S. 1335, 99th Cong., 1st Sess. (1985) ...................................... 1144
  Hearings before the Senate Committee on the Judiciary ...................... 1145
    Comments on S. 572 and S. 1385 .......................................... 1145
    Comments on the Administration Bill, S. 1335 ............................ 1148
  S. 2683, 99th Cong., 2d Sess. (1986) ....................................... 1152
  Conclusions Drawn from Legislative History ................................. 1155
Conclusion with respect to Defendant Thomas "Bud" McGrath's Motion to Dismiss
  Count I .................................................................... 1156
The Remedy ................................................................... 1158
DEFENDANT SHEILA SMITH'S MOTION TO DISMISS AND DEFENDANT
  JACK CONLEY'S OMNIBUS PRETRIAL MOTION: MOTION TO DISMISS
  COUNTS I AND II ............................................................ 1158
Vagueness, Facially and as Applied ........................................... 1158
Adequacy of the Statement of Illegal Gambling Business Object and Offense..... 1160
Conclusion ................................................................... 1162
ORDER OF COURT ............................................................... 1162

## MEMORANDUM OPINION

LEE, District Judge.

Before the Court are Defendant Thomas "Bud" McGrath's Motion to Dismiss Count I (Document No. 388), Defendant Sheila F. Smith's Motion to Dismiss (Document No. 381), Defendant John Francis "Jack" Conley's Omnibus Pretrial Motion: Motion to Dismiss (Document No. 374, in part), Defendant Mark A. Abbott's Motion to Dismiss on the Grounds of Duplicitous Indictment or, in the Alternative, to Elect (Document No. 252) and Defendant Thomas "Bud" McGrath's Motion to Dismiss or, in the Alternative, to Elect or Force the Government to Divide Count I on the Grounds of Duplicitous Indictment (Document No. 389). Before addressing the motions, the Court will summarize the pertinent parts of the Indictment.

## THE INDICTMENT

### *Introduction*

The Indictment contains an Introduction section before Count I begins. The introduction alleges that Duffy Conley was the owner and operator of Duffy's Vending and/or Three Rivers Coin, which had the primary purpose of facilitating an illegal gambling business based on video poker machines. The illegal gambling business was carried on by Duffy Conley "and his associates and employees."

The Introduction identifies the remaining Defendants and their roles as follows. William C. Curtin was the general manager of Duffy's Vending, assisting Duffy Conley in daily operations.

Sheila Smith was an office manager, accountant and bookkeeper for Duffy Conley, also supervising employees who placed, moved and serviced video poker machines.

Jack Conley recorded service calls from locations and facilitated the movement, repair and servicing of video poker machines.

Bud McGrath, Duffy Conley's employee, marketed and secured locations for Duffy Conley's video poker machines.

Mark Abbott, Duffy Conley's employee, marketed, moved and secured locations for Duffy Conley's video poker machines.

The Introduction alleges that certain Defendants assisted Duffy Conley by facilitating the placement and use of illegal gambling devices at various locations under their control as follows:

| | |
|---|---|
| Thomas Rossi | Carnegie American Legion |
| William Steinhart | Carnegie American Legion |
| Roberta Fleagle | Terry's Snack Shop |
| Robin Spratt | Terry's Snack Shop |
| Monica Kail | Kail's Coffee Corner |
| William Reed | Idlewood Inn |
| Joanne Smith | The Coffee Pot |
| Kenneth "Ron" Goodwin | The Coffee Shop, and Bloomfield Snack Shop |
| Lawrence "Neudy" Demino, Sr. | The Sunny Farms Deli |
| William Rusin | Mugshots, and Cruisin II |

The Introduction alleges that Duffy Conley employed Chris Kail, Joseph Devita, Frank Garofalo, Thomas Ciocco, Michael Sukaly, Phillip "Mike" Ferrell, Anestos "Naz" Rodites and others known and unknown to the Grand Jury as collectors whose duties included going to machine locations and collecting the proceeds of video poker machine gambling.

The Introduction alleges that William Rusin was an "associate" of Duffy Conley, who entrusted Rusin with depositing proceeds of the illegal gambling business into Pittsburgh National Bank account # 2–680118, the Duffy's Vending Account.

The Introduction alleges two "essential parts" of the illegal gambling business. Paragraph 8 of the Indictment alleges:

8.) The placement and use of the video poker machines as illegal gambling devices at various locations, such as taverns, sandwich shops, fraternal clubs, restaurants and convenience stores, in the Western District of Pennsylvania and other places was an essential part of the illegal gambling business that was run by JOHN F. "DUFFY" CONLEY and his associates and employees.

Indictment, ¶ 8 (Document No. 1). Paragraph 18 of the indictment alleges:

18.) *It was an essential part of the illegal gambling business run by JOHN F. "DUFFY" CONLEY that the proceeds of this unlawful activity be collected from the various locations where the video poker machines were in use as illegal gambling devices.* To accomplish this collection activity, Duffy's Vending and/or Three Rivers Coin maintained a group of employees whose primary job was to travel to the locations, *divide the proceeds from the illegal gambling activity with a person at each location, collect the share of the proceeds owed to Duffy's Vending/Three Rivers Coin and in turn deliver that money to another employee of JOHN F. "DUFFY" CONLEY or deposit the money into a designated bank account which was ultimately controlled by JOHN F. "DUFFY" CONLEY.*

Indictment, ¶ 18 (Document No. 1) (emphasis added).

### Count One: The Conspiracy

Count One, the conspiracy count, is set forth in three sections: "The Conspiracy and its Objects," "Manner and Means of the Conspiracy" and "Overt Acts."

"The Conspiracy and its Objects"

Paragraph 21 of the Indictment constitutes "The Conspiracy and its Objects," stating:

21.) Beginning on or around 1984 through and including September 20th of 1991, in the Western District of Pennsylvania and elsewhere, the defendants ... knowingly and unlawfully did conspire, combine, confederate and agree together and with each other and with other persons both known and unknown to the grand jury, to commit offenses against the United States, that is:

(a) It was a part and object of the conspiracy that the above named defendants, and other persons known and unknown to the grand jury, *did* knowingly and unlawfully conduct, finance, manage, supervise, direct and own all or part of an illegal gambling business involving video poker machines in violation of the laws of the Commonwealth of Pennsylvania [Title 18, Pennsylvania Consolidated Statutes, Section 5513], the state in which the illegal gambling business was conducted. This illegal gambling business involved five (5) or more persons who conducted, financed, managed, supervised, directed and owned all or part of the business, remained in substantially continuous operation for a period in excess of thirty (30) days, and had a gross revenue of more than $2000 for a single day, in violation of Title 18, United States Code, Section 1955.

(b) It was further a part and object of the conspiracy that the above named defendants, and others known and unknown to the grand jury, *did* knowingly and unlawfully conduct or attempt to conduct financial transactions affecting interstate or foreign commerce, which transactions involved the proceeds of a specified unlawful activity, that is, illegal gambling with video poker machines, knowing that the property involved in such financial transactions represented the proceeds of the illegal gambling activity, and with the intent to promote the carrying on of the specified unlawful activity, illegal gambling with video poker machines, that is, during the period November 1986 through September 1991 *cash proceeds from illegal gambling involving video poker machines was [sic] received, transferred, delivered, deposited or otherwise transacted* by the defendants in violation of Title 18, United States Code, Section 1956.

Indictment, ¶ 21 (Document No. 1) (emphasis added).[1]

"Manner and Means of the Conspiracy"

The "Manner and Means of the Conspiracy" is set forth in paragraphs 22 through 37. This section of the Indictment alleges as follows.

Between June, 1986 until at least April of 1991, Duffy Conley, Curtin, McGrath and Abbott sought locations in which to place video poker machines. From June of 1986 through December, 1989, Sheila Smith received requests for video poker machines and supervised the placement of them in various locations. From June of 1986 through December, 1989 Sheila Smith and Jack Conley and others received calls for servicing of machines and dispatched Duffy Vending employees to perform the services.

From May, 1989 through December, 1989 Duffy Conley and Curtin conducted periodic meetings during which employees of Duffy Vending were taught to instruct location operators how to use the "knock-off" and "meter" features on video poker machines and otherwise use the machines for illegal gambling.

From June of 1986 through December of 1989, employees of Duffy Conley, including Chris Kail, Devita, Garofalo, Ciocco, Sukaly, Ferrell and Rodites, collected the proceeds of video poker machines from various locations.

---

1. Although the prefatory language charges an agreement "to commit offenses," the statements of the objects of the conspiracy allege that the "defendants ... did" run an illegal gambling business and launder the proceeds thereof.

Locations were maintained where video poker machines were used as illegal gambling devices. Persons placed money in the machines, played the machines and received cash payoffs if they accumulated forty or more points.

The "Manner and Means of the Conspiracy" section reiterates the locations operated by various defendants, adding only the allegation that Monica Kail operated the Sheridan Coffee Shop, previously known as the Original Snack Shop, in addition to Kail's Coffee Corner.

Paragraph 28 alleges the procedure used to collect from locations the proceeds of the illegal gambling, stating:

> 28.) It was further a part of the conspiracy that during the time period November 1986 through December 1989 those persons working as collectors on behalf of JOHN F. "DUFFY" CONLEY would go to the various locations that had video poker machines used for illegal gambling and check the accounting information contained in each video poker machine to determine the total amount of money played and the total number of "hits", or the amount of money paid out of the machine, since the last collection period. The collector would then either actually open the machines and collect the proceeds from the machine or would confer with a representative of each location and review the accounting for the period of time since the last collection. Based on that accounting the collector would collect the amount of proceeds due to JOHN F. "DUFFY" CONLEY and either or both of them would count the same to determine a total amount of the collection. Some part of the proceeds were then deposited to the bank accounts of Duffy's Vending and/or Three Rivers Coin at various branches of Pittsburgh National Bank.

Indictment, ¶ 28 (Document No. 1).

From 1986 through early 1989, Duffy Conley purchased from a wholesaler of video games in Imperial, PA video poker machines equipped to be used as illegal gambling devices with proceeds of the illegal gambling business in the form of cash and checks. The wholesaler sold the machines to Duffy Conley and delivered them to his employees.

Duffy Conley and William Curtin used cash proceeds from the illegal gambling business to pay Duffy Vending employees, and to supplement their paychecks with envelopes of cash.

William Rusin deposited into Duffy Vending's Robinson Township Pittsburgh National Bank account proceeds of the illegal gambling business in the form of cash and checks.

In January 1990 Duffy Conley instructed an employee to purchase property in McKees Rocks, Pa. to be used as a facility to service the poker machines that had previously been serviced by Duffy's Vending. Duffy Conley gave the employee money to purchase the property and told the employee whom to hire as service technicians. This business for the servicing of video poker machines was called Matrix.

In January of 1990 Duffy Conley and others created three entities. Duffy Conley and Ciocco created T D Amusements. Duffy Conley and Ferrell created S & M Vending. Duffy Conley and an unindicted co-conspirator known to the grand jury created Chartiers Vending.

From 1988 through 1990 Duffy Conley attempted to expand his illegal gambling business to areas outside the state of Pennsylvania by sending employees and machines to other states.

### "Overt Acts"

The conspiracy count alleges sixty-eight (68) overt acts were committed in furtherance of the conspiracy. Roughly one-third of the overt acts alleged are acts most directly related to procuring, setting up and maintaining video poker machines at various locations. See Overt Act Nos. 1–5, 10–13, 16–25, 63, 65, 67, 68. Several relate to pay-offs being made. See Overt Act Nos. 53–56.

Numerous overt acts relate to actions by defendants depositing in, holding or withdrawing from Duffy Conley's bank accounts the proceeds of the illegal gambling business. In Overt Act Nos. 14, 15, 30 & 31, Sheila Smith is alleged to have prepared proceeds for deposit in Duffy Conley's accounts, deposited them there and written checks upon the proceeds. In Overt Act Nos. 33–39, 41 & 43, Duffy Conley is alleged to have possessed in his bank accounts proceeds of the illegal gambling business, which had been deposited by his employees. Rusin is alleged to have made deposits into Duffy Conley's accounts in Overt Act Nos. 40 and 42.

Numerous overt acts allege that persons made payments to Matrix by way of checks drawn upon various banks. Duffy Vending employees Ferrell and Ciocco, as well as Duffy Conley himself, are alleged to have made such payments by check. Overt Act Nos. 46, 47, 50–52. Location operators Goodwin, Fleagle and Spratt are also alleged to have made payments to Matrix by check. Overt Act Nos. 48, 49, 58–61.

Numerous Defendants are identified as having committed acts related to the collection, division and distribution of the proceeds of the illegal gambling business. Such overt acts are alleged to have been committed by Duffy Conley, and Duffy Vending employees Sheila Smith, Sukaly, Devita, Chris Kail, Garofalo, Ciocco, Ferrell and Rodites, and location operators Rossi, Steinhart, Reed and Monica Kail. Overt Act Nos. 6–8, 26–29, 32, 57, 65 & 66.[2]

Finally, Overt Act Nos. 9 and 62 allege that Rossi and Joanne Smith, respectively, cashed checks to enable players to gamble on video poker machines in their establishments.

### Count Two: Illegal Gambling Business

Count Two, the illegal gambling business count, charges all Defendants as follows:

The grand jury further charges:

Beginning on or around June of 1984, and continuing to on or around September 1991 in the Western District of Pennsylvania and elsewhere, the defendants ... along with others known and unknown to the grand jury did unlawfully and knowingly conduct, finance, manage, supervise, direct and own all or part of an illegal gambling business involving video poker machines in violation of the laws of the Commonwealth of Pennsylvania [Title 18, Pennsylvania Consolidated Statutes, Section 5513], the state in which the illegal gambling business was conducted. This illegal gambling business involved five (5) or more persons who conducted, financed, managed, supervised, directed and owned all or part of the business, remained in substantially continuous operation for a period in excess of thirty (30) days and had a gross revenue of more than $2000 for a single day.

All in violation of Title 18, United States Code, Section 1955 and Title 18, United States Code, Section 2.

Indictment, at 34–35.

### DISCUSSION

### DEFENDANT THOMAS "BUD" McGRATH'S MOTION TO DISMISS COUNT I (DOCUMENT NO. 388)

Defendant Thomas "Bud" McGrath, in his Motion to Dismiss Count I (Document No. 388), raises a challenge to Count One on the basis that charging the money laundering object of the conspiracy in addition to the substantive illegal gambling business in Count Two violates the constitutional prohibition against double jeopardy in that Congress did not intend multiple convictions and punishments for the conduct alleged in the two counts. In doing so, McGrath also raises the issue of the proper relationship between illegal gambling business offenses and money laundering offenses. He states:

---

2. As to six of the location operators, Rossi, Steinhart, Monica Kail, Reed, Joanne Smith and Demino, the Indictment does not allege, by way of introduction, charge or overt act, any transaction involving the banking system. Steinhart, Monica Kail and Reed have already pleaded guilty to all charges against them.

Clearly, the crime of money laundering is aimed at conduct that "was not previously punished criminally", and that "follows in time" the underlying crime. Contrary to Congressional intent, the alleged money laundering activity in this case does not "follow in time" the activity of conducting an illegal gambling business. In fact, the money laundering activity charged in this case is temporally and statutorily the same activity necessary to conduct an illegal video poker gambling business.

McGrath's First Supplemental Brief in Support of Motion to Dismiss Count 1, at 13 (Document No. 628) (quoting *United States v. Edgmon*, 952 F.2d 1206, 1213–14 (10th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 3037, 120 L.Ed.2d 906 (1992)).

The Double Jeopardy Clause of the Fifth Amendment, which provides that no person shall "be subject for the same offense to be twice put in jeopardy of life and limb ...," U.S. Const.Amend. V, has been interpreted to provide three forms of protection. "The Double Jeopardy Clause 'protects against a second prosecution for the same offense after acquittal. It protects against a second prosecution for the same offense after conviction. And it protects against multiple punishments for the same offense.'" *United States v. Grayson,* 795 F.2d 278, 281 (3d Cir.1986) (quoting *North Carolina v. Pearce,* 395 U.S. 711, 717, 89 S.Ct. 2072, 2076, 23 L.Ed.2d 656 (1969)), *cert. denied,* 479 U.S. 1054, 107 S.Ct. 927, 93 L.Ed.2d 978; 481 U.S. 1018, 107 S.Ct. 1899, 95 L.Ed.2d 505 (1987). As Defendant McGrath's double jeopardy challenge arises in the context of a single indictment, the protection against multiple prosecutions does not apply. Only the protection against multiple punishments applies in this case.

■ The Double Jeopardy Clause's protection against multiple punishments in a single case ensures only that a court does not impose punishment in excess of the punishment intended by the legislature. "With respect to cumulative sentences imposed in a single trial, the Double Jeopardy Clause does no more than prevent the sentencing court from

prescribing greater punishment than the legislature intended." *Missouri v. Hunter,* 459 U.S. 359, 366, 103 S.Ct. 673, 678, 74 L.Ed.2d 535 (1983). This Court's inquiry begins with the question of whether the legislature—in this case, Congress—intended each violation of separate statutes to be separate offenses. *Garrett v. United States,* 471 U.S. 773, 778, 105 S.Ct. 2407, 2411, 85 L.Ed.2d 764 (1985).

The starting point in determining whether Congress intended the violation of separate statutes to be the "same offense" is the so-called "*Blockburger* test." In *Blockburger v. United States,* 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932), the Supreme Court restated its test for determining whether violation of two distinct statutes by way of a single act constituted the "same offense." It said:

> The applicable rule is that, where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one is whether each provision requires proof of an additional fact which the other does not.

*Id.* at 304, 52 S.Ct. at 182. The Court has made clear, however, that "[t]he rule stated in *Blockburger* was applied as a rule of statutory construction to help determine legislative intent." *Garrett,* 471 U.S. at 778–79, 105 S.Ct. at 2411; *see also Hunter,* 459 U.S. at 368, 103 S.Ct. at 679; *Albernaz v. United States,* 450 U.S. 333, 340, 101 S.Ct. 1137, 1143, 67 L.Ed.2d 275 (1981); *Whalen v. United States,* 445 U.S. 684, 691–92, 100 S.Ct. 1432, 1437–38, 63 L.Ed.2d 715 (1980). Although a determination that violation of two statutes is the "same offense" under the *Blockburger* test raises a presumption that Congress did not intent multiple punishments, that presumption must yield to a clearly expressed contrary intent. As the *Hunter* Court explained:

> In *Whalen* we ... noted that *Blockburger* established a rule of statutory construction in these terms: "The assumption underlying the rule is that Congress ordinarily does not intend to punish the same offense under two different statutes. Ac-

cordingly, where two statutory provisions proscribe the 'same offense,' they are construed not to authorize cumulative punishments in the absence of a clear indication of contrary legislative intent." 445 U.S., at 691–92, 100 S.Ct., at 1437–1438 (emphasis added). We went on to emphasize the qualification on that rule: "[W]here the offenses are the same . . . cumulative sentences are not permitted, unless elsewhere specially authorized by Congress." *Id.*, at 693, 100 S.Ct., at 1438 (emphasis added). *Hunter*, 459 U.S. at 366–67, 103 S.Ct. at 678. In short, determining whether Congress intended to permit multiple punishments entails "an analysis of the substantive criminal law." *Gillespie v. Ryan*, 837 F.2d 628, 632 (3d Cir.), *cert. denied*, 488 U.S. 833, 109 S.Ct. 90, 102 L.Ed.2d 66 (1988).

■ Defendant McGrath's double jeopardy challenge is two-fold. First, he contends that the conspiracy to launder money is the same offense as the substantive illegal gambling business charge. Second, he implicitly contends that an illegal gambling business is a lesser included offense of laundering the "proceeds" of an illegal gambling business, despite his being charged with substantive illegal gambling but not substantive money laundering.[3]

The Court concludes that Congress intended multiple punishments for a conspiracy to launder money and violation of the substantive illegal gambling business prohibition. The elements of conspiracy include an agreement. While violation of the illegal gambling business prohibition requires participation of five or more persons, an agreement is not an element of the offense. *See Iannelli v. United States*, 420 U.S. 770, 788, 95 S.Ct. 1284, 1295, 43 L.Ed.2d 616 (1975). Likewise, to violate the illegal gambling business prohibition, one must actually engage in such a business. An agreement to launder the "proceeds" of an illegal gambling business does not require operation of the illegal gambling business. One could agree first to operate the business and then to launder its "proceeds" without actually engaging in either activity. A conspiracy to launder money and a substantive violation of the illegal gambling business prohibition are not the "same offense" under *Blockburger*.

■ McGrath's second argument has more substance. For an agreement to constitute a conspiracy under 18 U.S.C. § 371, the object of the agreement or the means of effectuating it must be illegal. If, as Defendant McGrath contends, Congress did not intend that the conduct alleged in the money laundering object of the conspiracy be money laundering, the money laundering object of the conspiracy fails to state an offense. If violation of the illegal gambling prohibition is a lesser included offense of money laundering and Congress's intent to impose multiple punishments is not clear, the propriety of alleging a "lesser included object" as a separate object must be addressed. If Congress intended the facts alleged to be covered by both statutes, with multiple punishments, a conspiracy alleging both objects is properly charged.

Defendant McGrath contends that the money laundering object of the conspiracy is the "same offense" as the illegal gambling business object of the conspiracy under *Blockburger*, citing *United States v. Edgmon*,

---

3. Part of the difficulty in framing the issues arises from the manner in which the Government framed the money laundering object of the conspiracy in Count One. Although not all Defendants are charged with money laundering in the substantive counts of the Indictment, the money laundering object of the conspiracy states that "[i]t was further a part and object of the conspiracy that the above named defendants, and others known and unknown to the grand jury, *did* knowingly and unlawfully conduct or attempt to conduct financial transactions. . . ." Indictment, ¶ 21(b) (Document No. 1) (emphasis added). The Court concludes that Defendant McGrath properly raised not only the relationship of the conspiracy to launder money to illegal gambling but also the relationship of substantive money laundering to substantive illegal gambling. As will be discussed shortly, the relationship of substantive money laundering and substantive illegal gambling businesses is relevant to a conspiracy charge alleging both crimes as objects of the conspiracy.

952 F.2d at 1213. In *Edgmon*, a father and son were convicted of conspiracy to convert and converting cattle securing a Farmers Home Administration loan, and the father was convicted of laundering the proceeds of the conversion with the intent to conceal in violation of 18 U.S.C. § 1956(a)(1)(B)(i). *Id.* at 1208. The cattle, owned by the son, was sold in the father's name. The father purchased land and a tractor with the money from the sale, obtained a loan using his purchases as collateral and paid an amount equivalent to the price of the cattle to his son from the borrowed funds. *Id.* at 1210–11. The father challenged his conviction for money laundering on the grounds that it was a second punishment for the same offense under *Blockburger.*

As the government in *Edgmon* did not dispute the father's contention that the conversion and the money laundering failed the *Blockburger* test, the *Edgmon* court stated that it would assume that they did. Nonetheless, discussing *Garrett,* the court stated, "*As in the present case,* the two offenses [in *Garrett* ] 'failed' the *Blockburger* test because one served as an element of the other." *Id.* at 1213 (emphasis added). Noting that the *Blockburger* test is not determinative, the court went on to reject the father's contention, concluding that Congress intended punishment for the specified unlawful activity

4. The *Edgmon* court, citing *Garrett,* determined whether multiple punishments violated the Double Jeopardy Clause by looking at the actual crimes charged in the indictment. *Edgmon,* 952 F.2d at 1214; *see Garrett,* 471 U.S. at 786, 105 S.Ct. at 2415 ("In order to properly analyze the successive prosecution issue, we must examine not only the statute which Congress has enacted, but also the charges which form the basis of the Government's prosecution here"). Regarding the offenses before it, the *Edgmon* court stated:

While some of the evidence presented on the two offenses may overlap, the actual conduct and the nature of the conduct constituting the two offenses are not the "same." One is simply a sale of cattle. The other is a line of financial transactions that result in the parties holding essentially the same amount of cash in the form of a check at the end of the transactions as they held at the beginning of the transactions. To convict of money laundering, the jury had to find that [the father] not only assisted in the conversion of FmHA collateral

and, in addition, the money laundering activity.[4]

The court now turns to the application of the *Blockburger* test to Sections 1956(a)(1)(A)(i) and 1955. Sections 1956(a)(1)(A)(i) and 1956(c)(7) provide in relevant part:

s 1956. Laundering of monetary instruments

(a)(1) Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction *which in fact involves the proceeds of specified unlawful activity —*

(A)(i) with the intent to promote the carrying on of specified unlawful activity;

\*   \*   \*   \*   \*   \*

shall be sentenced to a fine of not more than $500,000 or twice the value of the property involved in the transaction, whichever is greater, or imprisonment for not more than twenty years, or both.

\*   \*   \*   \*   \*   \*

(c) As used in this section—

(7) the term "specified unlawful activity" means—

(A) any act or activity constituting an offense listed in section 1961(1) of this

but that he then attempted to take the proceeds of that conversion and enter financial transactions designed to conceal the origin of those proceeds.

*Id.* Even were *Edgmon* binding on this Court, it would not control this case. The lack of "sameness" between the money laundering activity and the "specified unlawful activity" in *Edgmon* distinguishes it from this case. The essence of McGrath's argument is that "the money laundering activity charged in this case is temporally and statutorily the same activity necessary to conduct an illegal video poker gambling business."

Although *Edgmon* may have inappropriately transferred the *Garrett* successive prosecution analysis to a multiple punishment context, and *Garrett's* extended *dicta* on "multilayered conduct" may be outmoded by *United States v. Dixon,* — U.S. ——, 113 S.Ct. 2849, 125 L.Ed.2d 556 (1993), the distinction highlighted in the above quoted passage remains pertinent to the statutory construction of the money laundering statute.

title except an act which is indictable under subchapter II of chapter 53 of title 31;

\* \* \* \* \* \*

18 U.S.C. § 1956(a)(1)(A)(i) & (c)(7) (emphasis added). The requirement that a "financial transaction" must "in fact involve[ ] the proceeds of specified unlawful activity" imposes on the Government the burden of showing a "specified unlawful activity" in fact occurred. That is, the money laundering statute requires proof of a specified unlawful activity without expressing its elements in the statute. Before concluding that the money laundering statute and "specified unlawful activity" fail the *Blockburger* test, two points give the Court pause.

First, while the Indictment alleges that the specified unlawful activity in this case is conducting an illegal gambling business, the statute does not require that this *particular* crime furnish the required specified unlawful activity. Second, an implied, shared element of offenses standing in the relationship of greater and lesser included offenses is the identity of the perpetrator. The money laundering statute does not require that the person conducting the financial transaction be the person who committed the specified unlawful activity. For instance, a "smurf"—a person who structures transactions to avoid reporting requirements by depositing less than $10,000 at a time—with no connection to a drug sale can be convicted of laundering the money obtained in exchange for the drugs.[5]

The first point, regarding the money laundering offense's capacity to be predicated upon "specified unlawful activity" other than

an illegal gambling business, is controlled by precedent. In *Harris v. Oklahoma*, 433 U.S. 682, 97 S.Ct. 2912, 53 L.Ed.2d 1054 (1977) (per curiam), the Supreme Court held that robbery was a lesser included offense of felony murder, notwithstanding the felony murder statute's specification of the predicate offense of "a felony," rather than the elements of robbery. Therefore, successive prosecution for one would not lie after trial on the other. *Accord Payne v. Virginia*, 468 U.S. 1062, 104 S.Ct. 3573, 82 L.Ed.2d 801 (1984) (per curiam).

In *Whalen*, a multiple punishment case, the Court, construing a statute passed by Congress for the District of Columbia as incorporating the *Blockburger* test, reached the same conclusion with respect to felony murder and rape. The Court stated, "[P]roof of rape is a necessary element of proof of the felony murder, and we are unpersuaded that this case should be treated differently from other cases in which one criminal offense requires proof of every element of another offense." *Whalen*, 445 U.S. at 694, 100 S.Ct. at 1439.

In the recent successive prosecution case of *United States v. Dixon*, —— U.S. ——, 113 S.Ct. 2849, 125 L.Ed.2d 556 (1993), five justices supported the principle of *Harris*, but not its application to orders of court predicate to criminal contempt proceedings. Justice Scalia, joined by Justice Kennedy, set forth the interpretation:

In this situation, in which the contempt sanction is imposed for violating the order through commission of the incorporated drug offenses, the later attempt to prosecute Dixon for the drug offense resembles

---

5. *But see* U.S. Dep't of Justice, *Handbook on the Anti–Drug Abuse Act of 1986*:

It is well documented in money laundering prosecutions that while money laundering organizations are intimately connected to the criminal organizations they are servicing, they tend to run parallel to these organizations with few, if any, direct bridges running between the two. Accordingly, only individuals within or intelligence concerning the criminal organizations actually generating the illegal proceeds will be able to provide proof of the generation of these proceeds through "specified unlawful activity." Indeed, it is often true that the highest-level money launderer paid to launder ille-

gal proceeds may not "know" the specific unlawful origin of the money. Thus, even with cooperation from individuals within the laundering organization, prosecutors may lack sufficient facts to supply the proof necessary to establish the "specific [sic] unlawful activity" nexus which is an element of Section 1956. Consequently, it is suggested that substantive Section 1956 charges be considered as a means to prosecute money generating corrupt organizations or individuals.

*Id.* at 68, *quoted in*, Strafer, *Money Laundering: The Crime of the '90's*, 27 Am.Crim.L.Rev. 149, 182 & n. 179 (1989).

the situation that produced our judgment of double jeopardy in *Harris*.... There we held that a subsequent prosecution for robbery with a firearm was barred by the Double Jeopardy Clause, because the defendant had already been tried for felony-murder based on the same underlying felony. We have described our terse per curiam in *Harris* as standing for the proposition that, for double jeopardy purposes, "the crime generally described as felony murder" is not "a separate offense distinct from its various elements." *Illinois v. Vitale*, 447 U.S. 410, 420–421, 100 S.Ct. 2260, 2267, 65 L.Ed.2d 228 (1980). *Accord Whalen v. United States*, 445 U.S. 684, 694, 100 S.Ct. 1432, 1439, 63 L.Ed.2d 715 (1980). So too here, the "crime" of violating a condition of release cannot be abstracted from the "element" of the violated condition. The Dixon court order incorporated the entire governing criminal code in the same manner as the *Harris* felony-murder statute incorporated the several enumerated felonies. Here, as in *Harris*, the underlying substantive criminal offense is "a species of lesser-included offense."

*Dixon*, —— U.S. at ——, 113 S.Ct. at 2857; *see also Grady v. Corbin*, 495 U.S. 508, 528, 110 S.Ct. 2084, 2097, 109 L.Ed.2d 548 (1990) (Scalia, J., dissenting) ("We have departed from *Blockburger's* exclusive focus on the statutory elements of crimes in only two situations. One occurs where a statutory offense expressly incorporates another statutory offense without specifying the latter's elements"), *overruled, Dixon*, —— U.S. at ——, 113 S.Ct. at 2859–65; *Borchardt v. United States*, 469 U.S. 937, 941, 105 S.Ct. 341, 344, 83 L.Ed.2d 276 (1984) (Brennan, J., dissenting from denial of certiorari). This interpretation of *Harris* focuses exclusively on the elements of the compound statute, including the elements of the alternative underlying statute that is in fact charged. *Dixon*, —— U.S. at ——, 113 S.Ct. at 2861.

Chief Justice Rehnquist, joined by Justices Thomas and O'Connor, believed that *Harris* was misapplied by Justice Scalia because the contempt statute in *Dixon* made no express reference to any other statute. Regarding the interpretation of *Harris*, however, Chief Justice Rehnquist stated:

Close inspection of the crimes at issue in *Harris* reveals ... that our decision in that case was not a departure from *Blockburger's* focus on the statutory elements of the offenses charged. In *Harris*, we held that a conviction for felony murder based ·on a killing in the course of an armed robbery foreclosed a subsequent prosecution for robbery with a firearm. Though the felony-murder statute in *Harris* did not require proof of armed robbery, it did include as an element [of] proof that the defendant was engaged in the commission of some felony.... We construed this generic reference to some felony as incorporating the statutory elements of the various felonies upon which a felony-murder conviction could rest.... The criminal contempt provision involved here, by contrast, contains no such generic reference which by definition incorporates the statutory elements of assault or drug distribution.

*Id.* at ——, 113 S.Ct. at 2867 (Rehnquist, C.J., dissenting in part and concurring in judgment in part) (citations omitted). Chief Justice Rehnquist further explained the *Harris* principle by example, stating, "Taking the facts of *Harris* as an example, a defendant who commits armed robbery *necessarily has satisfied one of the statutory elements of felony murder.*" *Id.* (emphasis added).

Section 1956(a) requires that the financial transaction "in fact involve the proceeds of specified unlawful activity," and "specified unlawful activity" is defined with reference to other statutes, without enumeration of the elements of each of the statutes. When a particular defendant commits a *particular* "specified unlawful activity," that defendant "necessarily has satisfied one of the statutory elements" of a Section 1956(a)(1)(A)(i) violation. That money laundering could be predicated upon proof of one of a host of specified unlawful activities other than conducting an illegal gambling business does not serve to prevent the illegal gambling business from being a "a species of lesser included offense" of money laundering, if it is the elements of the illegal gambling business upon which the Government seeks to rely to prove "specified unlawful activity."

The Court concludes that the second point, regarding the implied identity of actors in lesser and greater included offenses, should be resolved by analogy to the first point. If the Government alleges that the specified unlawful activity and the money laundering were committed by the same person, the specified unlawful activity should be considered "a species of lesser included offence." Just because the implied identity of actors will not necessarily hold in another case should not prevent the specified unlawful activity from being a lesser included offense of money laundering. When a *particular* defendant commits a particular "specified unlawful activity," *that* defendant "necessarily has satisfied one of the statutory elements" of a Section 1956(a)(1)(A)(i) violation.

In this case, the conspiracy count is alleged in such a manner that each Defendant is alleged to have conducted an illegal gambling business and laundered the proceeds thereof. An illegal gambling business is the alleged "specified unlawful activity," and all defendants are alleged to have participated in both the gambling business and the money laundering. The Court concludes that in such circumstances the illegal gambling business charge and the money laundering charge fail the *Blockburger* test. Therefore, absent a clear expression of congressional intent to the contrary, the Court must presume that Congress did not intend multiple punishments in the same trial. *Hunter*, 459 U.S. at 366–67, 103 S.Ct. at 679.

In understanding the intent of Congress with respect to the relationship between "specified unlawful activity," particularly conducting an illegal gambling business, and the money laundering offense under 18 U.S.C. § 1956(a)(1)(A)(i), some background regarding the two statutes will be useful. The Court will first discuss the prohibition of illegal gambling businesses and its interpretations. It will then turn to the money laundering statute and the intent of Congress in passing it.

Title 18, United States Code, Section 1955(a) & (b) prohibits "illegal gambling businesses," stating:

Prohibition of Illegal Gambling Businesses

(a) Whoever conducts, finances, manages, supervises, directs or owns all or part of an illegal gambling business shall be fined not more than $20,000 or imprisoned not more than five years, or both.

(b) As used in this section—

(1) "illegal gambling business" means a gambling business which—

(i) is a violation of the law of a State or political subdivision in which it is conducted;

(ii) involves five or more persons who conduct, finance, manage, supervise, direct or own all or part of such business; and

(iii) has been or remains in substantially continuous operation for a period in excess of thirty days or has a gross revenue of $2,000 in any single day.

(2) "gambling" includes but is not limited to pool-selling, bookmaking, maintaining slot machines, roulette wheels or dice tables, and conducting lotteries, policy bolita or numbers games, or selling chances therein.

(3) "State" means any State of the United States, the District of Columbia, the Commonwealth of Puerto Rico, and any territory or possession of the United States.

18 U.S.C. § 1955(a) & (b). Section 1955 itself is a broad statute.

■ It can be determined from the statute itself that for the prohibition of illegal gambling businesses to apply substantively, the participation of "five or more persons who conduct, finance, manage, supervise, direct or own all or part of such business" is required. *See Iannelli v. United States*, 420 U.S. 770, 772, 782 n. 15, 95 S.Ct. 1284, 1287, 1292 n. 15, 43 L.Ed.2d 616 (1975). "Major gambling activities were a principal focus of congressional concern. Large-scale gambling enterprises were seen to be both a substantive evil and a source of funds for other criminal conduct. *See* S.Rep. No. 91–617, pp. 71–73 (1969). [footnote omitted]. Title VIII [including Section 1955] thus was enacted 'to give the Federal Government a new substantive weapon, a weapon which will strike at organized crime's principal source of reve-

nue: illegal gambling.' *Id.*, at 71." *Id.* at 787–88, 95 S.Ct. at 1295. The requirement that a gambling business have five or more participants was intended "to restrict federal intervention to cases in which federal interests are substantially implicated." *Id.* at 789, 95 S.Ct. at 1296.

Not only is it clear from the statute itself that participation of five or more persons is required, it is also clear that the offense is a continuing, course of conduct offense. One alternative means of qualifying as an "illegal gambling business" under Subsection 1955(b)(1)(iii) is for the gambling business to be "in substantially continuous operation for a period in excess of thirty days...." 18 U.S.C. § 1955(b)(1)(iii).[6]

■ Section 1955 brought within the scope of articulated federal power "gambling businesses" involving five or more participants that engaged in activities illegal under state law. Although the federal offense is a felony with a maximum sentence of imprisonment of not more than five years, the subject of the gambling business need only be "a violation of the law of a State or political subdivision in which it is conducted." 18 U.S.C. § 1955(b)(1)(i); *cf. United States v. Berent,* 523 F.2d 1360 (9th Cir.1975) (violation of civil gambling regulations will not support a Section 1955 indictment). That is, gambling activity constituting only a misdemeanor under state law nonetheless can support a felony conviction under Section 1955 of the participants in a gambling business.[7]

Although the gambling activities of the illegal gambling business must be in violation of the law of the place where they occur,

Section 1955 does not make the gambling activities themselves a federal offense. Rather, Section 1955 prohibits *the illegal gambling business.* "The allowable unit of prosecution under § 1955 is defined as participation in a single 'illegal gambling business.' Congress did not assimilate state gambling laws *per se* into the federal penal code, nor did it define discrete acts of gambling as independent federal offenses." *Sanabria v. United States,* 437 U.S. 54, 70, 98 S.Ct. 2170, 2182, 57 L.Ed.2d 43 (1978). Section 1955's prohibiting illegal gambling businesses, not discrete violations of local law, has important ramifications for the nature of the federal illegal gambling business offense.

■ First, the illegal gambling business is the "allowable unit of prosecution," and a single illegal gambling business must be charged in a single count, even though it operates in violation of more than one local law. *Id.* at 65–66 nn. 19 & 20, 98 S.Ct. at 2179 nn. 19 & 20. Stated in the parlance of the conspiracy law, such a gambling business is one offense with multiple objects. Second, a defendant may incur federal criminal liability by participating in any manner in an illegal gambling business, even though his own activity was not in violation of local law. *Id.* at 70 & n. 26, 98 S.Ct. at 2182 & n. 26; *see also United States v. Riehl,* 460 F.2d 454 (3d Cir.1972) ("A street runner for a numbers business 'conducts' that business in the sense that he carries it on"). Third, the elements of 1955(b)(1) are jurisdictional and need only be proved with respect to the gambling business, not individual defendants.

---

**6.** The other alternative means of qualifying as a "illegal gambling business" under Subsection 1955(b)(1)(iii) is for the gambling business to have "a gross revenue of $2,000 in any single day" *Id.* As the offense is a continuing, course-of-conduct offense, having a gross revenue of $2,000 on more than one day, or even more than thirty days, would not engender criminal liability for more than one illegal gambling business.

**7.** The predicate state law violation alleged in this case is a first degree misdemeanor. Title 18, Pa.Cons.Stat.Ann., Section 5513(a)(1) states:

§ 5513. Gambling devices, gambling, etc.
(a) Offense defined.—A person is guilty of a misdemeanor of the first degree if he:
(1) intentionally or knowingly makes, assembles, sets up, maintains, sells, lends, leases,

gives away, or offers for sale, loan, lease or gift, any punch board, drawing card, slot machine or any device to be used for gambling purposes, except playing cards;
(2) allows persons to collect and assemble for the purpose of unlawful gambling at any place under his control;
(3) solicits or invites any person to visit any unlawful gambling place for the purpose of gambling; or
(4) being the owner, tenant, lessee or occupant of any premises, knowingly permits or suffers the same, or any part thereof, to be used for the purpose of unlawful gambling.
18 Pa.Cons.Stat.Ann. § 5513(a) (Purdon 1983).

*Id.* 437 U.S. at 68 n. 22, 70 & n. 26, 98 S.Ct. at 2181 n. 22, 2182 & n. 26.

The Court now turns to the money laundering statute, which states in pertinent part:

s 1956. Laundering of monetary instruments

(a)(1) Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity—

(A)(i) with the intent to promote the carrying on of specified unlawful activity; or

(ii) with intent to engage in conduct constituting a violation of section 7201 or 7206 of the Internal Revenue Code of 1986; or

(B) knowing that the transaction is designed in whole or in part—

(i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity; or

(ii) to avoid a transaction reporting requirement under State or Federal law, shall be sentenced to a fine of not more than $500,000 or twice the value of the property involved in the transaction, whichever is greater, or imprisonment for not more than twenty years, or both.

\*     \*     \*     \*     \*     \*

(c) As used in this section—

(1) the term "knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity" means that the person knew the property involved in the transaction represented proceeds from some form, though not necessarily which form, of activity that constitutes a felony under State, Federal, or foreign law, regardless of whether or not such activity is specified in paragraph (7);

(2) the term "conducts" includes initiating, concluding, or participating in initiating, or concluding a transaction;

\*     \*     \*     \*     \*     \*

(7) the term "specified unlawful activity" means—

(A) any act or activity constituting an offense listed in section 1961(1) of this title except an act which is indictable under subchapter II of chapter 53 of title 31;

\*     \*     \*     \*     \*     \*

(d) Nothing in this section shall supersede any provision of Federal, State, or other law imposing criminal penalties or affording civil remedies in addition to those provided for in this section.

18 U.S.C. § 1956 (Supp.1993). An illegal gambling business meets the definition of "specified unlawful activity" under Subsection 1956(c)(7)(A) because it is included in the definition of "racketeering activity" under Title 18, United States Code, Section 1961(1).

Unlawful activity other than money laundering itself appears three times in the section of the money laundering statute pursuant to which the Defendants are charged in this case. The pertinent section of 1956 states:

(a)(1) Whoever, *knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity,* conducts or attempts to conduct such a financial transaction *which in fact involves the proceeds of specified unlawful activity —*

(A)(i) with the intent to promote the carrying on of *specified unlawful activity;*

18 U.S.C. § 1956(a)(1)(A)(i). "[T]he term 'knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity' means that the person knew the property involved in the transaction represented proceeds from some form, though not necessarily which form, of activity that constitutes *a felony* under State, Federal, or foreign law, regardless of whether or not such activity is specified in paragraph (7), [enumerating 'specified unlawful

activities']." *Id.* § 1956(c)(1) (emphasis added).[8]

The requirement that the money laundering transaction "in fact involve[ ] the proceeds of specified unlawful activity" strongly suggests that the specified unlawful activity precedes and is separate from the money laundering transaction. In the typical case—for instance, a distribution of a controlled substance in violation of 21 U.S.C. § 841(a)—the specified unlawful activity is committed *uno actu.* Money then in the criminal's hands is clearly "proceeds" of a completed criminal act.

Where illegal gambling is the specified unlawful activity, the meaning of the requirement that the "financial transaction" must "in fact involve the proceeds of specified unlawful activity" is not similarly clear. An illegal gambling business is not only a continuing, course-of-conduct offense, it is an offense requiring the participation of five or more persons. The illegal gambling business offense is very broad; a defendant can be convicted upon a showing of knowing participation in any manner in the illegal gambling business. Yet, the gambling business itself, not the discrete state law violations, is the unit of the federal offense.[9] Due to the breadth of the illegal gambling business offense, acts within its scope can also meet the definition of a "financial transaction" under Section 1956(a)(1)(A)(i).

In this case, the proper application of Section 1956(a)(1)(A)(i) to the money laundering object of the conspiracy count is not clear. The money laundering object of the conspiracy count states:

> (b) It was further a part and object of the conspiracy that the above named defendants, and others known and unknown to the grand jury, did knowingly and unlawfully conduct or attempt to conduct financial transactions affecting interstate or foreign commerce, which transactions involved the proceeds of a specified unlawful activity, that is, *illegal gambling with video poker machines,* knowing that the property involved in such financial transactions represented *the proceeds of the illegal gambling activity,* and with the intent to promote the carrying on of the specified unlawful activity, *illegal gambling with video poker machines,* that is, *during the period November 1986 through September 1991 cash proceeds from illegal gambling involving video poker machines was [sic] received, transferred, delivered, deposited or otherwise transacted by the defendants* in violation of Title 18, United States Code, Section 1956.

Indictment, ¶ 21(b) (Document No. 1) (emphasis added).[10] As the money laundering object of the conspiracy is alleged, the single illegal gambling business fills all three "unlawful activity" roles in the Section 1956(a)(1)(A)(i) charge.[11] The Defendants

---

**8.** In this case, the Government must prove that the Defendants were aware that their conduct violated some felony gambling statute, presumably Section 1955. As 18 Pa.Cons.Stat.Ann. § 5513 is a misdemeanor statute, a Defendant's knowing that his or her conduct violated that statute would not meet the element contained in the first phrase of Section 1956(a).

**9.** The Indictment, strictly speaking, does not allege that the specified unlawful activity is a Section 1955 illegal gambling *business.* The money laundering object of the conspiracy count identifies the specified unlawful activity as "illegal gambling with video poker machines." Indictment, ¶ 21(b), at 8–9 (Document No. 1). This phraseology is repeated in each of the substantive money laundering counts. *Id.,* counts 13–29. The Government disavows any purpose to base the money laundering charges on any activity other than a Section 1955 violation. *See* Government's Second Omnibus Response to Defendants' Pretrial Motions, at 26–27 and *infra* p. 88.

**10.** Eight of the seventeen substantive money laundering counts alleged in the Indictment were in most regards identical to the statement of the money laundering object of the conspiracy. Counts 13–20. These counts differed in that not all defendants are charged in the substantive counts and checks, as well as cash, are alleged to have been the subject of the financial transactions. As of the date of this Opinion, most of the substantive money laundering counts have been dismissed without prejudice for being duplicitous—alleging more than one financial transaction in a single count. *See United States v. Conley,* 826 F.Supp. 1536 (W.D.Pa.1993) (Document No. 712, Crim. No. 91–178).

**11.** This need not be the case for a violation of Section 1956(a)(1)(A)(i) to be made out. In fact, none of the three "unlawful activities" need be the same. In conducting a financial transaction, the launderer could know that money is derived from a state law felony such as robbery, the robbery could have been perpetrated by someone

are alleged to have known that the property involved—the cash—was the proceeds of the illegal gambling business. The specified unlawful activity from which the cash in fact was derived is alleged to be the illegal gambling business. And the specified unlawful activity in furtherance of which the money laundering transaction is alleged to have been made is the same illegal gambling business.

The Government must prove that the Defendants conducted, financed, managed, supervised, directed or owned an illegal gambling business, as defined in Section 1955(b), as a necessary predicate to money laundering. Due to the breadth of the crime of participating in an illegal gambling business, the conduct of knowingly receiving, transferring, delivering, depositing or otherwise transacting the cash taken from video poker machine activity illegal under local law, if proved, would satisfy the "conduct, finance, manage, supervise, direct or own" element of a Section 1955 illegal gambling business offense.

Yet, this same conduct is alleged to constitute financial transactions with the intent to promote the carrying on of the illegal gambling business. Notwithstanding the requirement that the subject of the "financial transaction" must "in fact involve the proceeds" of the joint, continuing offense of participating in an illegal gambling business, the money laundering object of the conspiracy alleges—as money laundering—conduct clearly within Congress' definition of participation in an illegal gambling business.

The Government contends that it is the clear intent of Congress that money, once wagered by being fed into a video poker machine operated in violation of state law, be considered "proceeds" of an illegal gambling business. As noted above, however, Section 1955 does not make discrete state gambling law violations a federal offense. The essence of the federal offense is the joint, continuous operation of *an illegal gambling business.*

Moreover, the Government's interpretation of the money laundering statute also results in certain elements of the money laundering

statute being rendered superfluous. Congress, in one phrase of the statute, incorporates by reference the elements of some "specified unlawful activity," in this case illegal gambling. Irrespective of the actual intent of Congress regarding multiple punishments for the offenses, the illegal gambling business offense is a species of lesser included offense of Section 1956(a)(1)(A)(i). In addition to the elements of the specified unlawful activity, Congress required that other elements be present before the offense of money laundering under Section 1956(a)(1)(A)(i) is proved.

In addition to the requirement that the "financial transaction" must "in fact involve[ ] the proceeds of specified unlawful activity," Section 1956(a)(1)(A)(i) requires that two knowledge or intent requirements be met. First, the Defendants must know that the property involved in the financial transaction represents the proceeds of some form of felony. Second, the financial transaction must be undertaken with the intent to promote the carrying on of specified unlawful activity.

The definition of "financial transaction" is the source of further elements to be proven. A financial transaction can be shown one of two ways. First, there can be a disposition of property, the disposition affecting in any way or degree interstate or foreign commerce involving the movement of funds by wire or other means, involving one or more monetary instruments, or involving the transfer of title to real property, vehicle, vessel, or aircraft. Second, there can be a transaction involving a financial institution engaged in, or the activities of which affect, interstate or foreign commerce in any way or degree.

The Government's position is that the literal scope of the statutes in question overlap, and where they overlap Congress clearly intended multiple punishments. The illegal gambling business offense can be shown through participation in any way in the operation of the business, including activities that meet the definition of financial transactions

---

else in violation of the Hobbs Act and the financial transaction could be undertaken with the

intent of financing the smuggling of counterfeit goods into the country.

under Section 1956(a)(1)(A)(i). To show money laundering, however, that participation must take the form of "financial transactions." Conduct falling within the greater offense of money laundering, therefore, would be a subset of conduct falling within the lesser included offense of participating in an illegal gambling business. As the illegal gambling business offense is a species of lesser included offense of money laundering under Section 1956(a)(1)(A)(i), this is neither remarkable nor surprising.

With the overlap thus set forth, the Government's position follows from the dictionary definition of the word "proceeds" as "what is produced by or derived from something (as a sale, investment, levy, *business*) by way of total return: the total amount brought in: YIELD, RETURNS...." *Webster's Third New International Dictionary (Unabridged)* 1807 (P.B. Gove ed. 1971) (emphasis added).[12] As soon as the money is deposited into a video poker machine, it is derived from the illegal gambling business by way of total (gross) returns. Because just about anything done with the money so deposited qualifies both as a "financial transaction" and participating in an illegal gambling business, the Government's position is that its allegations satisfy the requirement that the "financial transaction" must "in fact involve the proceeds of specified unlawful activity."

Once conduct is alleged or shown to constitute both the "financial transaction" and the "specified unlawful activity" at the same time, it follows that the remaining intent elements of a Section 1956(a)(1)(A)(i) violation are established. In fact, it *necessarily* follows that the remaining intent elements of a Section 1956(a)(1)(A)(i) violation are made out, and therein lies the difficulty with the Government's position.

Where "specified unlawful activity" is a joint, continuing offense defined so that it can be carried on by activity also qualifying as "financial transactions," proof establishing one tier of the three tier structure of Section 1956(a)(1)(A)(i)—that a defendant conducted "a financial transaction which in fact involves the proceeds of specified unlawful activity"— necessarily includes proof establishing the other two. Proof that a defendant engaged in the specified unlawful activity necessarily means that the defendant knows from what crime the money has been derived—the first tier—and that the defendant had the actual intent to engage in specified unlawful activity—which surely includes the "intent to promote the carrying in of specified unlawful activity." If the conduct of engaging in "specified unlawful activity" is the same conduct constituting the "financial transaction," proof of the specified unlawful activity, and the additional characteristics of the specified unlawful activity that qualify it as a "financial transaction," necessarily satisfies all three tiers of the money laundering statute— though these requirements are found in but one of the tiers.

It is particularly suggestive of a problem with the Government's position that the portions of the money laundering statute rendered superfluous are elements of intent. If the conduct to which the elements of intent relate—the financial transaction—is the same conduct as the specified unlawful activity, the elements of intent will *always* be satisfied and rendered superfluous by proof of specified unlawful activity. If Defendant McGrath is correct, and Congress intended to require proof of two elements of intent, specified unlawful activity, and a financial transaction not within the scope of specified unlawful activity, the elements of intent will *never* be satisfied and rendered superfluous by proof of specified unlawful activity without more. If the statute is read to require a

---

**12.** Proceeds is also defined to have a "net" meaning. The definition cited in the text continues as follows:

b: the net profit made on something ... 2: the net sum received (as for a check, a negotiable note, an insurance policy) after deduction of any discount or charges.

*Id.; see also Webster's New World Dictionary of American English* 1072 (3d College ed. 1988)

("the money or profit derived from a sale, business venture, etc."). Giving "proceeds" a "net" meaning is less favorable to the Government's contention. Because such a "net" meaning implies that gross income is not all "proceeds," it follows that any individual item of income cannot be deemed "proceeds" upon receipt.

financial transaction *in addition to and separate from specified unlawful activity,* proof of additional conduct is required and the elements of intent further define the additional, prohibited conduct.

Thus, an equally rational interpretation of the requirement that the "financial transaction" must "in fact involve[ ] the proceeds of specified unlawful activity" is as a device to limit the scope of the money laundering statute. Under such a reading the money laundering statute does not extend its reach into the already illegal "specified unlawful activity" to punish the same conduct under two statutes. Rather, the money laundering statute punishes separate conduct that was not readily punishable before its passage. This interpretation avoids rendering two of the three tiers of Section 1956(a)(1)(A)(i) superfluous.

The Department of Justice has recognized this problem of interpretation in the related context of financial crimes and fraud. In an October 1, 1992 "Bluesheet" updating the United States Attorneys' Manual with respect to money laundering prosecutions and forfeitures, Robert S. Mueller, III, Assistant Attorney General, Criminal Division, states:

**B. Consultation Requirement in Certain Cases**

In the following instances, the United States Attorney's Office must consult with the Money Laundering Section prior to the filing of an indictment or complaint....

\* \* \* \* \* \*

3. *Cases Involving Financial Crimes:* In any case where the conduct to be charged as "specified unlawful activity" under §§ 1956 and 1957 consists primarily of one or more financial or fraud offenses, and where the financial and money laundering offenses are so closely connected with each other that there is no clear delineation between the underlying financial crime and the money laundering offense, no indictment or complaint may be filed without prior consultation with the Money Laundering Section.

*Explanation:* Sections 1956 and 1957 both require that the property involved

in the money laundering transaction be the *proceeds* of specified unlawful activity at the time that the transaction occurs. The statute does not define when property becomes "proceeds," but the context implies that the property will have been derived from an already completed offense, or a completed phase of an ongoing offense, before it is laundered. Therefore, as a general rule, neither § 1956 nor § 1957 should be used where the same financial transaction represents both the money laundering offense and a part of the specified unlawful activity generating the proceeds being laundered.

October 1, 1992 Bluesheet, updating USAM 9–105.000, ¶ B.3 (emphasis in original).

Consistent with Defendant McGrath's position, several courts, in other contexts, have interpreted the money laundering statute as not directly applying to "specified unlawful activity." The Second Circuit has stated, "Section 1956 creates the crime of money laundering, and it takes dead aim at the attempt to launder dirty money. Why and how that money got dirty is defined in other statutes. *Section 1956 does not penalize the underlying unlawful activity from which the tainted money is derived.*" *United States v. Stavroulakis,* 952 F.2d 686, 691 (2d Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 1982, 118 L.Ed.2d 580 (1992); *see also id.* ("The statute was designed to create a new federal crime, rather than to further penalize the underlying conduct"). Similarly, the Tenth Circuit has stated, "Congress aimed the crime of money laundering at conduct that follows in time the underlying crime rather than to afford an alternative means of punishing the prior 'specified unlawful activity.'" *United States v. Edgmon,* 952 F.2d at 1213–14; *accord, United States v. Johnson,* 971 F.2d 562, 569–70 (10th Cir.1992); *United States v. Lovett,* 964 F.2d 1029, 1042 (10th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 169, 121 L.Ed.2d 117 (1992); *see also United States v. Smith,* 818 F.Supp. 132, 133–34 (D.Maryland 1993); *United States v. Dimeck,* 815 F.Supp. 1425, 1429–30 (D.Kan.1993).

The Third Circuit's recent decision in *United States v. Paramo,* 998 F.2d 1212 (3d

Cir.1993) is not to the contrary. Although that case held that a financial transaction could be in furtherance of already concluded "specified unlawful activity," it does not stand for the proposition that the money laundering financial transaction and the specified unlawful activity may be one and the same act. The *Paramo* court specifically noted that the "specified unlawful activity," mail fraud, was "legally completed" prior to the financial transaction charged as money laundering. As *Paramo* is like *Edgmon* in this regard, *see supra* note 4, it does not answer the question of whether Congress intended that the same act be "specified unlawful activity" and money laundering at the same time.[13]

Because this ambiguity with respect to the requirement that the "financial transaction" must "in fact involve the proceeds of specified unlawful activity" is present in this case, the Court must take recourse to the legislative history of the statute to determine the intent of Congress.

Independent of the definitions of money laundering contained in the introduced bills, members of Congress had a clear conception of what constituted money laundering. For instance, Senator Thurmond, then Chairman of the Committee on the Judiciary, stated:

> Creation of a money laundering offense is imperative if our law enforcement agencies are to be effective against the organized

**13.** In one sense, *United States v. Johnson*, 971 F.2d 562 (10th Cir.1992) is like *Paramo* and *Edgmon.* In *Johnson*, the defendant operated a peso scheme, receiving wire transfers of funds from investors and sending wire transfers of a fraction of the funds back to the investors as profits. Both the receiving and sending wire transfers of funds were charged as money laundering transactions in criminally derived property under Section 1957. The Court stated, "The underlying criminal activity in this case was wire fraud, *which the defendant accomplished by causing the investors to wire funds to his account."* *Id.* at 569 (emphasis added). The statute violated was 18 U.S.C. § 1343. That statute, although implicating a scheme to defraud, defines the allowable unit of prosecution as each transmission in furtherance of the fraud. Like 21 U.S.C. § 841(a), 18 U.S.C. § 1343 is violated *uno actu* and does not constitute a continuing offense. *See Paramo*, 998 F.2d at 1216–1218; *cf. United States v. Hollis*, 971 F.2d 1441, 1451 n. 4 (10th Cir.1992) (mail fraud).

The defendant challenged the applicability of Section 1957 to the initial wire transfers. He contended that at the time of the initial wire transmissions, the funds were not yet "criminally derived property," a function of when "proceeds" were "obtained" from a criminal offense. The *Johnson* court agreed, remarking that "both the plain language of § 1957 and the legislative history behind it suggest that Congress targeted only those transactions occurring after proceeds have been obtained from the underlying unlawful activity." *Id.*

The defendant's only challenge to his convictions under Section 1957 for sending wire transfers of a fraction of the funds back to investors as profits was to the sufficiency of the evidence. The defendant did not challenge the status of the funds in his bank account as "proceeds" of the antecedent wire fraud. Rather he contended that his account contained funds from other sources and the prosecution had not proved that the funds wired back to investors came from the "proceeds" portion of the account. The court rejected the defendant's challenge.

In the present case, the Government contends that *Johnson* means that once the funds were possessed by the defendant, the transactions were, or could be, both part of an ongoing wire fraud scheme and money laundering in violation of Section 1957. The conduct punished as money laundering, the wire transfers back to investors, did violate the wire fraud statute as well as Section 1957. Nonetheless, this Court does not agree with the Government's interpretation of *Johnson.* First, as the court made clear, the underlying unlawful activity relied upon in relationship to the money laundering charges was not the ongoing peso scheme as a whole, but the acts of the defendant in causing investors to wire funds to his account. Apparently, no wire fraud charges were brought in relation to the wire transfers back to investors, and this conduct was alleged to constitute only money laundering, not specified unlawful activity. Second, a related point, the issue of whether Congress intended acts of "specified unlawful activity" to suffice as proof of money laundering as well was never raised or addressed in the *Johnson* opinion. Third, to the extent that the *Johnson* court addressed Congressional intent, its comments regarding the purpose of the money laundering legislation lends more support to Defendant McGrath's position than it lends to the Government's position—especially if the court's language is read in light of the fact that the specified unlawful activity was defined by a statute that is violated *uno actu.* Finally, the unaddressed legal issue lurking in *Johnson*—can a transfer by wire of funds derived from a previous act of wire fraud properly be charged as an act of money laundering with respect to the previous act of wire fraud, an additional act of wire fraud with respect to itself, or both—simply is not implicated by the indictment in this case. This case raises the question of whether the same conduct can be both specified unlawful activity and money laundering.

criminal groups which reap profits from unlawful activity by camouflaging the proceeds through elaborate laundering schemes.

132 Cong.Rec. 17,571 (1986); *see also White Collar Crime (Money Laundering): Hearings before the Senate Comm. on the Judiciary on Oversight of the Problem of White Collar Crime,* 99th Cong., 2d Sess., pt. 2, 1 (1986) (*"White Collar Crime Hearings"*) (statement of Senator Thurmond) ("Money laundering acts as a bridge for criminals who seek to turn proceeds from illegal activities into seemingly legitimate enterprises and profits"). Likewise, Senator Biden stated "Money laundering is the process by which the proceeds of crime are disguised to appear legitimate, using ordinary and not so ordinary financial transactions." *Id.; see also id.* at 18,487 ("Money laundering is the process by which one conceals the existence, illegal source, or illegal application of income and camouflages the source of that income to make it appear legitimate") (statement of Sen. Hatch).

While the preponderance of comments regarding "money laundering" related to the hiding and legitimizing money derived from crime and intended for consumption, several references were made to the evil of reinvestment in crime of money derived from crime. *See, e.g., id.* at 22,671 ("By laundering the proceeds of their ill-gotten gains, organized and petty criminals alike get access to the cash they need to buy the fancy cars, furs, and jewels they desire. And, most insidiously, they can use the laundered cash to purchase additional drugs to sell to innocent schoolchildren and desperate drug addicts") (statement of Rep. LaFalce); *id.* at 17,572 ("Regrettably, every dollar laundered means another dollar available to support new supplies of cocaine and heroin on the streets of this country") (statement of Sen. Biden); *White Collar Crime Hearings,* 99th Cong., 2d Sess. 20 (prepared statement of Senator Biden); *Id.* at 33 (prepared statement of Senator Grassley) ("Money laundering has be-

come a widespread practice where criminals use genuine financial institutions, or other means, to convert crime-related proceeds to seemingly legitimate funds, or assets, thereby circumventing the law, and furthering their criminal activities").

Congress passed Section 1956 as part of the Anti–Drug Abuse Act of 1986, P.L. 99–570, 100 Stat. 3207. The Senate and the House of Representatives, which had considered its own versions of a money laundering statute,[14] passed the consensus bill Money Laundering Crimes Act of 1986, S. 2683, 99th Cong., 2d Sess. (1986) in the form it was reported out of the Senate Committee on the Judiciary, with limited exceptions not relevant here.

S. 2683 has its origins in the recommendations of the interim report of the President's Commission on Organized Crime entitled, "The Cash Connection: Organized Crime, Financial Institutions, and Money Laundering." Two bills introduced in the Senate, S. 572, 99th Cong., 1st Sess. (1985) and S. 1385, 99th Cong., 1st Sess. (1985), were closely modeled on the recommended legislation contained in that report.

Senators D'Amato, Hawkins, Proxmire, Abdnor, Reigle and Wilson introduced S. 572, which provided, in relevant part:

**§ 1956 Laundering of Monetary Instruments**

(a) Whoever conducts or causes to be conducted a transaction or series of transactions involving one or more monetary instruments in, through, or by a financial institution which is engaged in, or the activities of which affect, interstate commerce, or attempts so to do—

(1) with intent to promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity; or

(2) with knowledge or reason to know that such monetary instruments represent income derived, directly or indirect-

14. H.R. 1367, 99th Cong., 1st Sess. (1985) (containing legislation proposed by the President's Comm. on Organized Crime); H.R. 1474, 99th Cong., 1st Sess. (1985); H.R. 2785, 2786, 99th Cong., 2d Sess. (1986) (containing the adminis-

tration proposals akin to S. 1335); H.R. 5077, 99th Cong., 2d Sess., *reintroduced as,* H.R. 5217, 99th Cong., 2d Sess. (1986); *see generally,* H.R.Rep. No. 855, 99th Cong., 2d Sess. pt. 1, at 1–7 (1986).

ly, from any unlawful activity, or the proceeds of such income,

shall be fined not more than $250,000 or twice the value of the monetary instruments, whichever is greater, or imprisoned not more than ten years, or both, for the first such offense, and shall be fined not more than $1,000,000 or five times the value of the monetary instruments, whichever is greater, or imprisoned not more than twenty years, or both for each such offense thereafter.

(b) As used in this section—

\*   \*   \*   \*   \*   \*

(5) the term "unlawful activity" means any act or acts constituting—

(A) a pattern of racketeering activity or collection of unlawful debt, as those terms are defined in section 901(a) of the Organized Crime Control Act of 1970 (18 U.S.C. 1961–1968);

\*   \*   \*   \*   \*   \*

(C) an offense under any of the following provisions of title 18, United States Code: ... section 1955 (relating to prohibition of illegal gambling businesses)....

\*   \*   \*   \*   \*   \*

(c) Nothing in this section shall supercede any provision of Federal, State, or other law imposing criminal penalties or affording civil remedies in addition to those provided for in this section.

\*   \*   \*   \*   \*   \*

S. 572, 99th Cong., 1st Sess. § 2(a) (1985). S. 572, which in substance contained only the above quoted language, was introduced in tandem with S. 571, 99th Cong., 1st Sess. (1985), which contained provisions for administrative summons in aid of enforcement and for increased fines for violations of the currency transaction reporting laws.

Senator DeConcini introduced S. 1385, which was also based upon the recommendations of the President's Commission on Organized Crime. S. 1385 provided, in relevant part:

## § 1956. Laundering of Monetary Instruments

(a) Whoever initiates or causes to be initiated a transaction or series of transactions involving one or more monetary instruments in, or through a financial institution which is engaged in, or the activities of which affect, interstate commerce, or attempts to do so—

(1) with intent to promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity; or

(2) with knowledge or reason to know that such monetary instruments represent income derived, directly or indirectly, from any unlawful activity, or the proceeds of such income,

shall be fined not more than $250,000 or twice the value of the monetary instruments, whichever is greater, or imprisoned for not more than ten years, or both, for the first such offense, and shall be fined not more than $1,000,000 or five times the value of the monetary instruments, whichever is greater, or imprisoned not more than twenty tears, or both, for each such offense thereafter.

\*   \*   \*   \*   \*   \*

(5) the term "unlawful activity" means any act or acts constituting—

\*   \*   \*   \*   \*   \*

(B) an offense under any of sections ... 1955 (relating to prohibition of illegal gambling businesses)....

\*   \*   \*   \*   \*   \*

(c) Nothing in this section shall supersede any provision of Federal, State or other local law imposing criminal penalties or affording civil remedies in addition to those provided for in this section.

\*   \*   \*   \*   \*   \*

S. 1385, 99th Cong., 1st Sess. § 2(a) (1985). S. 1385 also contained provisions for administrative summons in aid of enforcement and for increased fines for violations of the currency transaction reporting laws.

Senators Thurmond, D'Amato, Roth, Denton and Hawkins, on behalf of the Reagan Administration Department of Justice, intro-

duced S. 1335, which was structured in a manner similar to the other Senate bills. S. 1335, however, significantly modified the proposed legislation of the President's Commission on Organized Crime. S. 1335 provided, in relevant part:

§ 1956. **Laundering of monetary instruments**

(a) Whoever conducts, causes to be conducted, or attempts to conduct a transaction involving the movement of funds by wire or other electronic means or involving one or more monetary instruments, which in any way or degree affects interstate or foreign commerce, or conducts, causes to be conducted, or attempts to conduct such a transaction, through or by a financial institution which is engaged in, or the activities of which affect, interstate or foreign commerce in any way or degree—

(1) with the intent to promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity; or

(2) knowing or with reckless disregard of the fact that such monetary instruments or funds represent the proceeds of, or are derived directly or indirectly from the proceeds of, any unlawful activity,

shall be sentenced to a fine of not more than $250,000 or twice the value of the monetary instruments or wire transferred funds, whichever is greater, or imprisonment for not more than twenty years, or both.

\*　　\*　　\*　　\*　　\*　　\*

(c) As used in this section—

\*　　\*　　\*　　\*　　\*　　\*

(5) the term "unlawful activity" means any act or activity occurring in whole or in part in, or directed at, the United States and constituting an offense punishable by death or imprisonment for a term exceeding one year under the laws of the United States or any State of the United States in which the act or activity took place; and

(6) the term "reckless disregard" as used in paragraph (2) of subsection (a) means that the person is aware of a substantial risk that the monetary instruments or funds involved in the transaction represent the proceeds of, or are derived directly or indirectly from the proceeds of, any unlawful activity, but disregards the risk. A substantial risk means a risk (based on all the circumstances of the transaction including but not limited the amount and type of funds or monetary instruments and the nature of the transaction) that is of such a nature and degree that to disregard it constitutes a gross deviation from the standard of care that a reasonable person would exercise in such a situation

(d) Nothing in this section shall supersede any provision of Federal, State, or other law imposing criminal penalties or affording civil remedies in addition to those provided for in this section.

\*　　\*　　\*　　\*　　\*　　\*

S. 1335, 99th Cong., 1st Sess. § 2(a) (1985) (the "Administration bill").[15] The Administration bill would have created a new crime of "facilitation" by amending title 18, United States Code, Section 2 to contain the following:

.　(c) Whoever knowingly facilitates the commission by another person of an offense against the United States by providing assistance that is in fact substantial is punishable as a principal.

*Id.* § 7. The Administration bill also included a provision for an offense of receiving the proceeds of a crime. S. 1335 provided:

---

**15.** The maximum sentence for money laundering in the administration bill (and the statute adopted) is perhaps the clearest reflection of the statute's being the product of the "war on drugs." Stephen Trott, Assistant Attorney General, Criminal Division, in written responses to a written question propounded by Senator Spector stated, "Thus, with the separate designation of a crime entitled money laundering, *which has penalties substantially equivalent to narcotics statutes,* it is expected that money launderers will be incarcerated for a period of time *commensurate with the offense committed." White Collar Crime Hearings,* 99th Cong., 2d Sess. 165.

§ 2322. **Receiving proceeds of a crime**

Whoever receives, possesses, conceals, or disposes of, or attempts to receive, possess, conceal or dispose of, any money or other property which has been obtained in connection with a violation of any law of the United States for which the punishment may extend to imprisonment for more than one year; or brings or transfers into the United States any money or other property which has been obtained in connection with a violation of any law of a foreign country concerning the manufacture, distribution, or other form of trafficking in any substance listed in the current schedules of controlled substances established pursuant to section 202 of the Controlled Substances Act (21 U.S.C. 812) for which the punishment under the law of the foreign country may extend to imprisonment for a period of more than one year, knowing or believing the same to be money or property which has been obtained in violation of law, shall be imprisoned for not more than ten years, or fined not more than $250,000 or both.

*Id.* § 8(a). The Administration bill contained summons provisions and increased penalties. In addition, the Administration bill contained amendments to the Right to Financial Privacy Act and amendments to Federal Rule of Criminal Procedure 17 permitting "gag orders" against grand jury witnesses.

With S. 572, S. 1335 and S. 1385 before it, the Senate Committee on the Judiciary held a hearing on October 29, 1985 regarding legislation to combat money laundering. *See Money Laundering Legislation: Hearing on S. 572, S. 1335, and S. 1385 Before the Senate Comm. on the Judiciary,* 99th Cong., 1st Sess. (1985) ("*Money Laundering Legislation Hearing*"). The Committee again addressed money laundering during its oversight hearings on white collar crime on March 19 & 25, 1986. *White Collar Crime Hearings,* 99th Cong., 2d Sess., pt 2 (1986).

### Comments on S. 572 and S. 1385

James D. Harmon, Jr., Executive Director and Chief Counsel of the President's Commission on Organized Crime, explained to the Committee the origin of the bifurcated structure of sections (a)(1) and (2) in the Commission's proposed legislation. He stated:

> In drafting its proposed statute to make money laundering a Federal crime ... the Commission recognized that while all participants in a money laundering scheme might be deemed equally responsible for its success, some participants will be more knowledgeable than others about the illegal activities which generate the funds to be laundered. Those responsible for planning, organizing, and overseeing the scheme, for example, are more likely to be privy to information concerning the scope and extent of their *clients'* illegal activities. Such information would clearly indicate to any money launderer that his intent to carry out the laundering scheme successfully also constitutes intent to further or facilitate the conduct of the underlying illegal activities. In contrast, those responsible for more ministerial duties (such as picking up or delivery of the funds being laundered) may not know all the details of their *clients'* activities, but are highly likely to be exposed to information that gives them actual knowledge (or reason to know) the true nature or source of the funds they are laundering. For these reasons, the Commission decided to adopt a bifurcated standard of intent that would encompass both the director and the minions of a money laundering organization.

*Money Laundering Legislation Hearing,* 99th Cong., 1st Sess. 106 (prepared statement of James D. Harmon, Jr., Executive Director and Chief Counsel, President's Commission on Organized Crime) (emphasis added). Mr. Harmon noted that all three bills before the Senate shared this bifurcated standard of intent. *Id.* at 106–07.

Implicit in this choice of structure for the money laundering bills is that there be a completed crime that has generated proceeds. The recognition that the President's Commission conceptualized "money launderers" as persons distinct from their "clients" confirms that the targeted conduct is not the underlying crime.

As explained by Mr. Harmon, the "reason to know" prong in (a)(2), designed to bring within the scope of the statute those who

should know that the funds being transacted have their source in crime, contains a more easily satisfied standard of proof than the "intent to facilitate" prong, designed to bring within the scope of the statute those who so closely adhere to their clients' purpose as to share their clients' intent. As the proposed bills do not discriminate in punishment between the two prongs of section (a),[16] it is not clear under Mr. Harmon's explanation what purpose the more difficult to prove "intent to facilitate" prong serves.[17]

Stephen S. Trott, Assistant Attorney General, Criminal Division, appeared in favor of the Administration bill, S. 1335. *Money Laundering Legislation Hearings*, 99th Cong., 1st Sess. 53–73 (comments of Stephen S. Trott, Assistant Attorney General, Criminal Division). In doing so, he critiqued certain aspects of S. 572 and S. 1385.

He indicated that S. 1385, by defining the offense as "initiating or causing to be initiated a transaction ... involving monetary instruments in or through a financial institution," not only would fail to criminalize transactions outside of the banking institution, but may also fail to include financial institutions (and their employees) with the coverage of the statute. *Id.* at 66. Similarly, while S. 572 would include both banks and bank customers, it would not reach transactions outside of the banking system.[18] *Id.* at 66–67.

---

**16.** The Arizona statute referenced in Mr. Harmon's statement as the source of the bifurcated structure of the proposed federal money laundering statutes makes transactions conducted with knowledge or reason to know of the illegal source of the proceeds money laundering in the second degree, a Class 3 felony. One who "knowingly initiates, organizes, plans, finances, directs, manages, supervises or is in the business of money laundering" is guilty of money laundering in the first degree, a Class 2 felony. *Id.* at 115 (prepared statement of James D. Harmon, Jr., Executive Director and Chief Counsel, President's Comm. on Organized Crime, Appendix A).

**17.** Because the statute passed by Congress retained the bifurcated structure originally incorporated in the recommended legislation of the President's Commission on Organized Crime, albeit with altered content, Sections 1956(a)(1)(A) & (B) may still overlap. Their relationship *inter se* remains a source of confusion. In *United States v. Jackson*, 935 F.2d 832 (7th Cir.1991), the indictment and jury charge were framed such that the Government had to prove both the intent to promote the carrying on of specified unlawful activity and the knowledge that the transactions were designed to conceal the nature, location, source, ownership or control of the proceeds. Commenting on this, the court stated:

> The error in the indictment and the jury charge does point to another question, however, namely the relationship between § 1956(a)(1)(A)(i) and (a)(1)(B)(i). These two provisions are aimed at different activities, the first at the practice of plowing back proceeds of "specified unlawful activity" to promote that activity, the second at hiding the proceeds of the activity. *The different aims suggest that* the prosecution in a money laundering case will generally make its case under one provision or the other; only in the unusual case will the government be able to prove that a single transaction was intended to both promote an illegal activity and conceal the origin of the funds used in that activity.

*Id.* at 842. Notwithstanding the *Jackson* court's comments, it would appear that the exceptional case would be an open, undisguised transaction intended to promote the carrying on of specified unlawful activity; rarely, then, would a transaction in furtherance of specified unlawful activity not involve an intent to conceal the origin of the reinvested funds. *But see Paramo*, 998 F.2d 1212 (3d Cir.1993). Indeed, this point is illustrated by *Jackson* itself. The court first ruled that purchases of "beepers" with funds from several bank accounts containing, among other funds, proceeds of drug deals were intended to promote the future drug-dealing. *Id.* at 841. The court then proceeded to hold that the evidence *did not* show that purchases of mobile phones, payments of rent and checks written to "cash" were intended to promote drug dealing. *Id.* at 841. Yet the court found that these transactions were intended to conceal the origin of the funds because the transactions—purchases of goods and services—were made (1) not by the defendant, but at his direction and (2) using bank accounts controlled by the defendant, but not in his name. *Id.* at 841–42. The same bank accounts and, it appears, methods were used in purchasing the "beepers." *Id.* at 841. With respect to the "intent to conceal" prong, all the transactions in *Jackson* were indistinguishable.

*Jackson* is indicative of the malleability of Section 1956(a). The opinion indicates that money laundering was not charged for activities such as collecting money from several drug points of sale and depositing it in the accounts. Nonetheless, to a certain extent, the defendant's intent while having the money deposited in accounts controlled by him, but not in his name, formed the intent basis for the subsequent, charged transactions.

**18.** In White Collar Crime Hearing, Senator Biden indicated that successful enforcement of the Currency Transaction Report ("CTR") provisions of the Bank Secrecy Act would result in "a greater amount of illicit cash [being] physically

Neither S. 572 nor 1385 would reach wire transfers. *Id.* at 68.

Mr. Trott indicated that the "reason to know" standard should be replaced with a "reckless disregard" standard in section (a)(2) of the bills.[19] He advocated that the definition of the offense should not include reference to a "series of transactions" because "such a phrase makes the inclusion of multiple counts in an indictment more difficult and may allow certain money launderers to escape deserved punishment by casting several different crimes as but one." *Id.* He favored the Administration bill's inclusion of forfeiture and civil penalties.

Mr. Trott, preferring the Administration's proposal to make any federal or state felony a predicate offense, criticized S. 572 and S. 1385 for limiting predicate offenses to the lists in those bills, which closely tracked RICO predicate offenses. The Administration could "see no valid reason to limit the offense to laundering money derived from these crimes while not covering money derived from such heinous federal offenses as Presidential assassination and espionage, and such state offenses as gambling and prostitution." *Id.* at 67.

Richard Arcara, District Attorney, Buffalo, New York, appearing on behalf of the National District Attorneys Association, advocated changing S. 572 and S. 1385 by broadening their scope to cover transactions outside of the banking system and to cover, in addition to RICO offenses, other predicate offenses, including state offenses.[20] *Money Laundering Legislation Hearing,* 99th Cong., 1st Sess. 122–23 (comments of Richard Arcara, District Attorney, Buffalo, New York, on behalf of the Nat'l District Attorneys Ass'n). He reasoned, "Organized crime does not confine its money laundering operations to financial institutions nor does organized crime limit its illegal but profitable operation to violations of the RICO statute." *Id.* at 122.

Neal R. Sonnett appeared on behalf of the National Association of Criminal Defense Lawyers. He stated:

> The primary concern of the National Association of Criminal Defense Lawyers is in the bifurcated standard of intent that has been adopted in each of the three bills. Two of the bills use a standard of "reason to know," and the administration's proposal, S. 1335, uses a standard of "reckless disregard."
>
> We strongly oppose the adoption of either provision, because it would, in our view, result in liability for prosecution of individuals and corporations who were not involved in any way in money laundering as that term is commonly understood or reasonably defined.

*Money Laundering Legislation Hearing,* 99th Cong., 1st Sess. 124 (comments of Neal R. Sonnett, on behalf of the Nat'l Ass'n of Crim. Defense Lawyers).[21] Noting that the standard of intent in proposed section (a)(1)—the "intent to promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on

---

transported out of the United States by cargo and in luggage and by air...." *White Collar Crime Hearings,* 99th Cong., 2d Sess. 23.

**19.** Mr. Harmon recognized that the standard of intent in the Administration's bill was the stricter "reckless disregard" standard, rather than the "reason to know" standard of the Commission's proposal, and he attributed the difference, in part, to the broader scope of the Administration bill. *Money Laundering Legislation Hearings,* 99th Cong., 1st Sess. at 116. In contrast to the Commission's proposal, which would criminalize only transactions through banking institutions, the Administration bill "takes it a step further and recognizes that the money laundering process can begin before entry into a bank or financial institution and for that reason has adopted a narrower standard, it would seem to me." *Id.*

**20.** As will be discussed in relation to the Administration bill, Mr. Arcara's position was that "laundering of money obtained from State crimes" should be covered by federal law, but such a federal law be written in a manner that did not make the state crimes themselves "money laundering." *Id.* at 123.

**21.** Another witness also criticized the "reckless disregard," and implicitly, the "reason to know" standards. *Money Laundering Legislation Hearing,* 99th Cong., 1st Sess. at 166 (prepared statement of Earl B. Hadlow, Vice Chairman and General Counsel, Barnett Banks of Florida, on behalf of Am. Bankers Ass'n). The American Bar Association, Section of Criminal Justice, opposed both standards as too lax. *White Collar Crime Hearings,* 99th Cong., 2d Sess. 60.

of any unlawful activity"—tracks the language of the Travel Act, 18 U.S.C. § 1952(a)(3), Mr. Sonnett indicated that he had no difficulty with the standard. *Id.* at 130 (prepared statement of Neal R. Sonnett, on behalf of the Nat'l Ass'n of Crim. Defense Lawyers).

Several witnesses spoke in favor of the provisions of S. 572 and S. 1385 limiting "transaction" to acts involving financial institutions. *Money Laundering Legislation Hearing*, 99th Cong., 1st Sess. 197 (comments of Jerry Berman, on behalf of Am. Civil Liberties Union); *Money Laundering Legislation Hearing*, 99th Cong., 1st Sess. 227 (prepared statement of John K. Van De Kamp, Attorney Gen'l of the State of California).

### Comments on the Administration Bill, S. 1335

The Administration bill was controversial from the beginning. At the outset of the Hearing, several Senators expressed resistance to the Administration's request for sweeping new legislation. *See Id.* at 28 (prepared statement of Senator Mathias) ("I commend to my colleagues the other money laundering bills, Senate Bills 572 and 1385, ... that focus more narrowly on the activities we want to proscribe"); *id.* at 30 (prepared statement of Senator Biden) ("[A]t this stage I believe we should focus our attention on a narrowly drafted money laundering statute that will permit prosecution of those individuals making substantial deposits of illegally obtained currency. The need for that legislation has been established. However, before moving to the extreme measures proposed in the Administration's bill, I would need a substantial amount of justification that existing law and the recent changes to existing law in this are [sic] have failed"). Mr. Trott advocated the Administration ap-

proach as follows, "[W]hat we really need to do it stop chipping away at the edges and come into the middle with a sort of thermonuclear approach, called money laundering and wipe out all of the problems that are being created by the bank secrecy law...." *White Collar Crime Hearings*, 99th Cong., 2d Sess., pt. 2, 139 (testimony of Mr. Trott).[22]

Mr. Trott, after discussing the means used to launder criminally derived money ranging from absconding from the country with suitcases of cash to the use of sophisticated schemes involving professional persons in money laundering, agreed that there was a need for "new legislation to directly prohibit the laundering of money." *Id.* at 57 (prepared statement of Stephen Trott, Assistant Attorney General, Criminal Division). The Administration identified a three-fold gap in existing law as the reason for the need to create an independent, federal money laundering offense.

First, prior to the statute, prosecutions for money laundering had to be brought pursuant to the Bank Secrecy Act, and no prosecution could be brought where the transactions did not involve a "financial institution" under that Act. *See Money Laundering Legislation Hearing*, 99th Cong., 1st Sess. 58–60 (prepared statement of Mr. Trott); *White Collar Crime Hearings*, 99th Cong., 2d Sess., pt. 2, 127 (prepared statement of Mr. Trott) ("There are many forms of money laundering which are not and possibly never could be covered by the Bank Secrecy Act even if further amended"); *id.* at 156 (testimony of William F. Weld, U.S. Attorney for the Dist. of Mass.).

As an example of money laundering conduct that did not run afoul of the Bank Secrecy Act because it did not involve financial institutions, Mr. Trott cited the "acapa-

**22.** In addition to the broadly defined money laundering offense in proposed Section 1956 and the new offenses of facilitating a crime and receiving proceeds of a crime, controversial aspects of the bill included its amendments to the grand jury provisions of the Federal Rules of Criminal Procedure and the Right to Financial Privacy Act and the apparent inclusion of attor-

neys' fees in the scope of its forfeiture provisions. As only the proposed Section 1956 and the new offenses of facilitating a crime and receiving the proceeds of a crime are more than tangentially relevant to the issues presented in this case, the following analysis of the proceedings of the Committee on the Judiciary will not focus on the

dores" scheme uncovered in Puerto Rico.[23] Acapadores, who were dealers in illegally-traded lottery tickets, would purchase winning, legal, lottery tickets at a premium from their owners. Then, they would sell the winning tickets at a profit to clients seeking an apparently legal source of income. Most of the acapadores conduct was not in violation of any federal law. *Id.* at 59. Generally, Mr. Trott indicated that the Government has "no effective law with which to prosecute employees of businesses other than banks because of the necessity of proving that they were acting as employees of a financial institution and that therefore they had the obligation to file the required reports." *Id.* at 59.

Second, recent cases from several circuits had refused to impose a duty on bank customers regarding the filing of Currency Transaction Reports. *E.g., United States v. Varbel*, 780 F.2d 758 (9th Cir.1986); *United States v. Anzalone*, 766 F.2d 676 (1st Cir. 1985). Those cases were based in part on the fact that Congress had granted express authority for regulations imposing such a duty on bank customers, but the Department of the Treasury had opted not to issue such regulations. In the absence of a duty to furnish Currency Transaction Reports ("CTRs"), customers engaged in "smurfing"—structuring transaction to avoid reporting requirements by depositing less than $10,000—could not be convicted for defrauding the government of information to which it was entitled. *See White Collar Crime Hearings*, 99th Cong., 2d Sess., pt. 2, 127 (prepared statement of Mr. Trott); *id.* at 132 (prepared statement of William F. Weld, U.S. Attorney for the Dist. of Mass.).

Third, money could be laundered through technical compliance with the CTR requirements of the Bank Secrecy Act, as there was no federal statute, other than the Bank Secrecy Act, criminalizing this aspect of money laundering. As David D. Queen, Acting Assistant Secretary for Enforcement and Operations, Department of the Treasury, testified:

> Some drug smugglers, through an elaborate scheme of money laundering, shell corporations and the like, are able to process huge amounts of cash which on their face appear illicit. That is one of the rationales behind the efforts of the Departments of Justice and Treasury in seeking passage of [the Administration bill], because it is not in the most technical sense illegal for a shell corporation to process an enormous sum of cash, let us say a couple hundred thousand dollars, in one lump sum, fill out the CTR, but have as its real purpose the concealment of the source of the money, namely narcotics, numbers, or whatever it might be.

> The [Administration bill] would plug the gap that now exists, namely that you could theoretically comply with the Bank Secrecy Act and still be laundering money.

*White Collar Crime Hearing*, 99th Cong., 2d Sess. 26 (testimony of David D. Queen, Acting Ass't Sec'y for Enforcement and Operations, Dep't of the Treasury); *see also id.* at 132 (prepared statement of William F. Weld, U.S. Attorney for the Dist. of Mass.).[24]

The Administration bill was intended to penalize both parties to any laundering transaction. Mr. Trott stated:

> We have carefully drafted our bill . . . to include not only the person who, for example, deposits cash representing the proceeds of an unlawful drug transaction in a bank or uses such "dirty money" to buy a new car, but also the bank employee or car salesman who participated in the transaction by accepting the money if such person can be proved to have known or to have acted in reckless disregard of the fact that

---

other controversial aspects of the Administration bill.

**23.** Mr. Harmon, who also cited the acapadores scheme in his statement, revealed that the funds so laundered had been amassed by an organized crime group through its control of "policy betting" operations in several cities. *Id.* at 103–04.

**24.** As each of the bills before the Senate Committee on the Judiciary would have covered transactions in or through financial institutions, the purpose of "plugging the gap" existing in the Bank Secrecy Act is not unique to the Administration bill.

the money involved was derived from criminal activity.

*Id.* at 60.

The Administration bill provided in part, "Whoever conducts, causes to be conducted, or attempts to conduct a transaction ... involving one or more monetary instruments, which in any way or degree affects interstate or foreign commerce, ... (1) with the intent to promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity ..." is guilty of money laundering. The broad scope of the Administration's proposed Section 1956 was the subject of criticism.

Mr. Arcara, on behalf of the National District Attorneys Association, expressed concern regarding the effect on state crimes caused by the scope of the Administration bill. He stated:

> The administration's proposal ... attempts to provide the Government with the ability to strike at virtually all money laundering operations, but we feel that a literal interpretation of the administration's legislation may result in unintended Federal intrusions into crimes which are better suited to State prosecution. Specifically, any crime involving the transfer of money, checks or other monetary instruments could be considered a money laundering "transaction" under the administration's proposal. A theft, a robbery, a bad, forged or altered check would become a Federal money laundering offense.

*Id.* at 122 (comments of Richard Arcara, District Attorney, Buffalo, N.Y., on behalf of the Nat'l District Attorneys Ass'n). To remedy this excessive scope, Mr. Arcara recommended that a transaction include only voluntary, non-fraudulent interchanges and that there be a $10,000 jurisdictional minimum threshold for the federal money laundering crime. *See also id.* at 166 (prepared statement of Earl B. Hadlow, on behalf of the Am. Bankers Ass'n) ("S. 1335 defines "unlawful activity" to include any state or federal felo-

ny. All state felonies involving money would be federalized"); [25] *White Collar Crime Hearings,* 99th Cong., 2d Sess., pt. 2, 75 (Report of the Council on Criminal Justice Section to the ABA House of Delegates) ("Unlawful activity is defined in this legislation as any state or federal felony. By virtue of this definition, all state felonies involving money are federalized").

The criticism leveled at the scope of the Administration's proposed Section 1956 by two other witnesses was not limited to its intrusion into the definition of state crimes. These witnesses also criticized its intrusion into the definition of federal crimes.

Mr. Sonnett, on behalf of the National Association of Criminal Defense Lawyers, indicated that the Administration's proposed Section 1956 would make any crime to which money could be connected the crime of money laundering. He stated:

> The most glaring example of such overbreadth can be found in S. 1335 which, by its terms, can be applied in almost any circumstance involving the exchange of funds *before, during, or after any* federal or state criminal offense. This absurd and potentially dangerous result is reached through an all-embracing definition of the term "unlawful activity" [proposed § 1956(c)(5) ] and open-ended definitions of the terms "conducts" [proposed § 1956(c)(1) ], "transaction" [proposed § 1956(c)(2) ], and "monetary instruments" [proposed § 1956(c)(3) ]. Under these definitions, S. 1335 applies to *any* financial transactions, not just those involving financial institutions, and thus, can be directed at anyone involved in the exchange of funds, whether or not involved in or knowledgeable about the criminal offense itself. Both S. 572 and S. 1385, by contrast, define "unlawful activity" and "transaction" in terms that are more fairly focused on, and properly limited to, the activities sought to be proscribed.

*Id.* at 134 (prepared statement of Neal R. Sonnett, on behalf of the Nat'l Ass'n Crim.

---

**25.** Robert H. Hodges, Jr., on behalf of the Am. Bankers Ass'n, submitted to the Committee on the Judiciary during its hearings on White Collar Crime a prepared statement substantially identical to the prepared statement of Mr. Hadlow. *White Collar Crime Hearings,* 99th Cong., 2d Sess. 37–50.

Defense Lawyers) ("before, during, or after" emphasis added). Jerry Berman of the American Civil Liberties Union likewise recognized the broad sweep of the Administration proposal, characterizing the bill as a whole as "a prosecutor's 'wish list.'" *Id.* at 200, 211 (prepared statement of Jerry Berman, on behalf of the Am. Civil Liberties Union). He stated:

As the district attorney pointed out, [the Administration's proposed Section 1956] could cover someone buying dope on a corner on Florida, because that is money in an illegal transaction. That becomes money laundering. Any embezzlement, fraud, crimes which are covered by local, State and Federal law are swept within this broad new crime of money laundering.

As the Organized Crime Commission witness said, the administration did not decide to focus on financial institutions; they decided to take it a little broader. Well, they have taken it much broader.

*Id.* at 198 (comments of Jerry Berman, on behalf of the Am. Civil Liberties Union). In his prepared comments, he further stated:

[T]he administration's proposed crime of money laundering ... covers conduct far broader than what is commonly understood as money laundering activity. Although the administration testifies about criminal elements laundering cash through banks in amounts under the $10,000 reporting requirement of the Bank Secrecy Act by buying cashiers checks, money orders, and the like (e.g. "smurfing") or more broadly transferring illegal cash into stocks, bonds, real estate, or business ventures, the scope of the money laundering offense in section 2 of the bill is sweeping....

We read the crime to cover any crime and conduct which should not be criminal. It would cover drugs, illegal firearms, selling defective merchandise, fraud, embezzlement, and so on.

*Id.* at 204 (prepared statement of Jerry Berman, on behalf of the Am. Civil Liberties Union).

As the President's Commission had never addressed the issue, Mr. Harmon was not prepared to address Senator Biden's concern about whether the Administration bill "would ... permit Federal prosecution for any State or Federal crime in which the proceeds of the crime are laundered." *Id.* at 177. Senator Biden indicated to Mr. Harmon that this was among the aspects of the Administration bill "that go beyond a simple money laundering statute." *Id.*

Regarding the new offense of facilitating a crime, Mr. Trott set forth the Administration's purpose, stating:

This offense would not be limited just to money laundering but would be particularly applicable to money launderers. For example, the new offense would be committed by one who, for a fee, took currency that he knew was derived from a drug sale and exchanged it for cashier's checks to return to the drug dealer although the person took no part in the drug sale and was indifferent as to the source of the money. It would also be committed by a chemist who manufactures and sells a lawful but difficult to obtain ingredient to a person who he knows intends to use it to produce a controlled substance.

In short, one who provides substantial assistance to another in the commission of an offense engages in reprehensible conduct which should subject him to criminal liability as a principal. Yet some courts have held that such a person is not guilty as an aider and abettor under 18 U.S.C. 2(a) unless he consciously intends to make the criminal venture succeed. Other courts have held, however, that a person who knowingly furnishes material assistance such as bribe money or goods to a person who he is aware intends to use them in a crime has sufficient *scienter* for criminal liability under 18 U.S.C. 2. [footnote omitted]. The facilitation offense is intended to clarify the case law to ensure that one who knowingly furnishes such assistance to a criminal is punishable.

*Id.* at 63. The omitted footnote cites *Backun v. United States,* 112 F.2d 635, 637 (4th Cir.1940) for the proposition that " '[g]uilt as an accessory depends, not on 'having a stake' in the outcome of crime ... but on aiding and assisting the perpetrators; and those

who make a profit by furnishing to criminals, whether by sale or otherwise, the means to carry on their nefarious undertakings aid them just as truly as if they were actual partners with them having a stake in the fruits of their enterprise.'" *Money Laundering Legislation Hearing* at 63 n. 6 (prepared statement of Mr. Trott).[26]

Mr. Trott explained that the receiving proceeds of a crime offense, which applies to "money or other property" obtained in violation of federal felony statutes, would not be limited to money laundering. He noted, however, that it would be particularly applicable to money launderers. *Id.* at 63–64.

The Administration bill's proposed new offenses of receiving proceeds of a crime and facilitation were also criticized as being too broad, a fundamental change in well-established aiding and abetting law and not limited to the problem of money laundering. *Id.* at 140–42 & n. 16 (prepared statement of Neal R. Sonnett, on behalf of the Nat'l Ass'n Crim. Defense Lawyers); *id.* at 211 (prepared statement of Jerry Berman, on behalf of the Am. Civil Liberties Union). The facilitation offense was opposed on the grounds that "it is designed to inflict criminal punishment upon conduct that does not rise to the level of purposeful assistance required in the aiding and abetting statute." *White Collar*

*Crime Hearings,* 99th Cong., 2d Sess., pt. 2, 78 (Report of the Council on Criminal Justice Section to the ABA House of Delegates); *see also Money Laundering Legislation Hearing,* 99th Cong., 1st Sess. 141 & n. 16 (prepared statement of Mr. Sonnett, on behalf of the Nat'l Ass'n of Crim. Defense Lawyers).

### S. 2683

Having addressed money laundering in two sets of hearings, the Senate Committee on the Judiciary—in particular, Senators Thurmond, Biden, and DeConcini—produced S. 2683, 99th Cong., 2d Sess. (1986). S. 2683 was introduced by Senators Thurmond, Biden, DeConcini and D'Amato, was reported out of the Committee on July 31, 1986 by unanimous consent and, ultimately, passed by Congress as part of the Anti–Drug Abuse Act of 1986. A Report accompanied S. 2683 as it was reported out of the Committee on the Judiciary. Senate Comm. on the Judiciary, The Money Laundering Crimes Act of 1986, S.Rep. No. 99–433, 99th Cong., 2d Sess. (1986).[27]

In response to the concerns raised in the hearings on its predecessors, Section 1956(a)(1) adopted standards that were, in certain respects, broader than those contained in S. 572 and S. 1385, *e.g.,* by covering

**26.** The Administration's citation to *Backun v. United States,* 112 F.2d 635 (4th Cir.1940) as an example of aiding and abetting liability is somewhat disconcerting, especially since the Senate Report on S. 2683 repeats the citation. *See infra* p. 68. *Backun* is of questionable continuing vitality, even within the Fourth Circuit. *See United States v. Winstead,* 708 F.2d 925, 927 (4th Cir. 1983) ("To prove the crime of aiding and abetting the government must show that the defendant knowingly associated himself with and participated in the criminal venture"). The Seventh Circuit recently stated:

Under the older cases, illustrated by *Backun v. United States,* 112 F.2d 635, 636–37 (4th Cir. 1940), and *Bacon v. United States,* 127 F.2d 985, 987 (10th Cir.1942), it was enough that the aider and abettor knew the principal's purpose. Although this is still the test in some states (*see, e.g., Sanders/Miller v. Logan,* 710 F.2d 645, 652 (10th Cir.1983)), after the Supreme Court in *Nye & Nissen v. United States,* 336 U.S. 613, 619, 69 S.Ct. 766, 769, 93 L.Ed. 919 (1949), adopted Judge Learned Hand's test—that the aider and abettor "in some sort associate himself with the venture, that he par-

ticipate in it as in something that he wishes to bring about, that he seek by his action to make it succeed," *United States v. Peoni,* 100 F.2d 401, 402 (2d Cir.1938)—it came to be generally accepted that the aider and abettor must share the principal's purpose in order to be guilty of violating 18 U.S.C. § 2, the federal aider and abettor statute. *See, e.g., United States v. Paone,* 758 F.2d 774, 775–76 (1st Cir.1985). *United States v. Fountain,* 768 F.2d 790, 797–98, *amended and rehearing denied,* 777 F.2d 345 (7th Cir.1985), *cert. denied,* 475 U.S. 1124, 106 S.Ct. 1647, 90 L.Ed.2d 191 (1986). To the extent Congress sought to have the "intent to facilitate" prong of Section 1956(a)(1) establish a standard intent that is more relaxed than Section 2, it without doubt has the power to do so. The Court notes that Congress rejected the Administration request to amend Title 18, Section 2; the more relaxed standard applies, if at all, only to 18 U.S.C. § 1956(a)(1)(A)(i) and similar provisions in the money laundering statute.

**27.** Although the pertinent language of Section 1956 is set forth *supra,* p. 1136, and will not be set forth again, it would bear reviewing at this point.

transactions occurring outside of the financial system. In other respects, Section 1956(a)(1)'s standards are more restrictive than those proposed in S. 572 and S. 1385, e.g., Section 1956(a)(1)(B)(i) incorporates a "knowing" standard of intent rather than a "reason to know" standard of intent. In all respects, Section 1956(a)(1) is a narrower, more tightly drafted statute than the Administration bill.

The Report explained three fundamental changes in the approach contained in Section 1956(a)(1). It stated:

Section 1956(a)(1) is the basic money laundering offense. Although it is derived in part from both the Organized Crime Commission bill, S. 572, and the administration's bill, S. 1335, it differs from those measures in several important respects. First, it employs a scienter standard of "knowing," rather than "reason to know" or "reckless disregard." In fact, it has two "knowing" requirements. In order to prove a violation of the offense, the Government must show not only that the defendant knew the property involved in a transaction was *the proceeds of crime*, but also that the defendant either intended to *facilitate* a crime or knew that the transaction was designed to conceal the proceeds of a crime.

The "knowing" scienter requirements are intended to be construed, like existing "knowing" scienter requirements, to include instances of "willful blindness." See *United States v. Jewel*, 532 F.2d 697 (9th Cir.), *cert. denied*, 426 U.S. 951, 96 S.Ct. 3173, 49 L.Ed.2d 1188 (1976).... Similarly, the *"intent to facilitate"* language of the section is intended to encompass *situations like those prosecuted under the aiding and abetting statute* in which a defendant knowingly furnishes substantial assistance to a person whom he or she is aware will use that assistance to commit a crime. *See, e.g., Backun v. United States*, 112 F.2d 635 (4th Cir.1940).

This section also differs from the provisions of the Organized Crime Commission bill and the administration's bill in the nature of the transactions that it covers. The Organized Crime Commission bill lim-

ited its coverage to bank transactions, while the administration's bill extended to all transactions affecting interstate or foreign commerce. *This section takes a qualitatively different approach, applying its coverage to those transactions that can be said to constitute the core of money laundering—transactions designed to conceal or disguise the nature, location, source, ownership, or control of criminal proceeds, or to evade Federal or State cash reporting requirements.* This language is intended to include transactions designed to conceal the identity of the participants to a transaction, where it can also be proved that the funds involved in the transaction are in fact the proceeds of crime.

This section differs from the Organized Crime Commission bill and the administration's bill in its enumeration of the crimes from which the property involved in the transaction must derive. The Organized Crime Commission bill limited its application to the proceeds of the Racketeer Influenced and Corrupt Organizations [RICO] predicate crimes.... *The administration bill sought to cover the proceeds of any State or Federal crime.* This section attempts to strike a balance by covering the proceeds of Federal financial offenses and foreign drug offenses as well as RICO predicate offenses....

It should be noted that the section's limitation on the crimes from which the proceeds involved in a transaction must come applies to all of the section's components except one. The list of crimes is encompassed in the term "specified unlawful activity".... The section requires that the property involved in a transaction *must in fact be proceeds* of "specified unlawful activity," and that the participant to the transaction must intend to *facilitate* "specified unlawful activity" or know that the transaction is designed to conceal the proceeds of "specified unlawful activity." However, in order to fall within the section, the participant need not know that the property involved in the transaction represents the proceeds of "specified unlawful activity." He or she need only know that it represents the proceeds of some form of unlawful activity....

Senate Comm. on the Judiciary, The Money Laundering Crimes Act of 1986, S.Rep. No. 99–433, 99th Cong., 2d Sess. at 10–11 (1986) (emphasis added). Although it is true, as the Report indicates, that the Administration bill would have had application to all federal and state felonies, it can be seen above that section (a)(1) of the Administration bill was not limited to "proceeds" of crime. Section (a)(1) of the Administration bill would have applied to the use of money, from whatever source, in any transaction with the intent to commit a state or federal felony. In any event, S. 2683 clearly rejected the Administration approach and adopted a much narrower approach.

Like the Administration bill, sections (a)(1) of S. 572 and S. 1385 were not limited to the "proceeds" of a crime. They were more limited in scope because the transaction had to be in or through a financial institution and the crimes in furtherance of which the transaction could be were, in essence, limited to RICO offenses. Although S. 2683 removed the financial institution limitation and added to the number of predicate offenses for money laundering, it also introduced the requirement that the "financial transaction" must "in fact involve[ ] the proceeds of specified unlawful activity" as a limiting factor on the application of the money laundering offense's intent to facilitate prong.[28] 18 U.S.C. § 1956(a)(1)(A) (1986); 18 U.S.C. § 1956(a)(1)(A)(i) (1992). This limitation applies equally to transactions within and without financial institutions.

Two references in the Senate Report indicate that the drafters of the report believed that the meaning of "proceeds" was clear. First, discussing Section 1956(a)(3), relating to transactions involving "the proceeds of specified unlawful activity *with intent to violate or facilitate a violation of* section 7201 of 7206 of the Internal Revenue Code of 1954," the drafters of the Report indicated that tax evasion has no clearly identifiable proceeds.[29] The Report states:

> The section, as drafted, does not require that the funds involved in a transaction represent the "proceeds" of tax evasion, *because tax evasion, unlike other crimes, does not have any clearly identifiable "proceeds."* Rather, the section requires that the transaction be conducted with the intent to facilitate tax evasion. The section also requires that the funds involved in the transaction represent the proceeds of "specified unlawful activity," as defined in section (c)(7). This is done in order to ensure that the tax evasion involved in the transaction is not run-of-the-mill inflation of deductions or the like, but rather the nonreporting of income derived from racketeering, foreign drug operations, or other heinous crimes.

Senate Comm. on the Judiciary, The Money Laundering Crimes Act of 1986, S.Rep. No. 99–433, 99th Cong., 2d Sess. at 11–12 (1986) (emphasis added). Second, S. 2683 excepted violations of the Bank Secrecy Act, which constitute RICO predicate offenses, from the definition of "specified unlawful activity" because "there are not identifiable 'proceeds' of a Bank Secrecy Act violation as there are for other RICO predicates." *Id.* at 13.[30]

---

**28.** Section (a)(2) of S. 572 and S. 1385 did employ the word "proceeds" in relation to its "*reason to know*" standard of intent, stating that one had to have reason to know that funds "represent income derived, directly or indirectly, from any unlawful activity, or the proceeds of such income." Section (a)(2) of S. 1335 also employed the word "proceeds" in its "reckless disregard" standard of intent, but in a different sense. One had to know or act in reckless disregard of the fact that funds may "represent the proceeds of, or are derived directly or indirectly from the proceeds of, any unlawful activity."

**29.** Section 1956(a)(3) *was deleted from* S. 2683 before the bill was passed as part of the Anti–Drug Abuse Act of 1986. In 1988, however, a different provision covering the subject matter of

proposed Section 1956(a)(3) was added to 18 U.S.C. § 1956. *See* Section 1956(a)(1)(A)(ii), which shares the preamble language of Section (a)(1) and reads, "(ii) with intent to engage in *conduct constituting a violation* of section 7201 or 7206 of the Internal Revenue Code of 1986." 18 U.S.C. § 1956(a)(1)(A)(ii).

**30.** The Report states that violations of the Bank Secrecy Act are "covered by inclusion directly in the operative language of subsection (a), where they now appear." *Id.* at 14. Shortly thereafter, the Report explains the meaning of Section 1956(d), stating:

> Section 1956(d) merely states that nothing in the new section 1956 supersedes any provision of Federal or State law imposing criminal penalties or affording civil remedies in addition to

It is also significant that S. 2683 dropped the "intent to promote, *manage, establish,* carry on, or *facilitate the* promotion, *management, establishment,* or carrying on of any unlawful activity" language of the Travel Act and substituted the "intent to promote the carrying on of specified unlawful activity" language found in the statute. "Promote the carrying on" indicates that at least the primary focus of the statute is future "specified unlawful activity," especially in view of the deletion of "establish" and "manage." *Cf. Paramo*, 998 F.2d at 1216. The deleted language was a vestige of the Administration bill's proposal to punish as "money laundering" the use of money in relation to the commission of a crime and the Crime Commission's proposal to punish the use of financial institutions in relation to the commission of a crime.

The question presented by Defendant McGrath's double jeopardy challenge is whether Congress intended multiple punishments for "specified unlawful activity" and money laundering under Section 1956(a)(1)(A)(i). From the statute and its history, the Court reaches two related conclusions.

■ First, Congress intended that money laundering under Section 1956(a)(1)(A)(i) and the underlying specified unlawful activity be separate offenses, separately punishable, notwithstanding *Blockburger.* The statute was specifically written so that one who has not committed the underlying offense may still commit money laundering. Moreover, what is stated in *Edgmon*, 952 F.2d at 1214, is clear in the legislative history—the statute was aimed at conduct that fell outside of the then-existing prohibitions of federal law. The Court concludes that there is a clear manifestation of intent in the statute that "Congress enacted the money laundering statute to provide a punishment in addition to other punishment rather than instead of other punishment." *Id.*

those provided for in this section. *Thus, a person could be charged with both a violation of the new section 1956 and a violation of the Bank Secrecy act for causing a financial institution to fail to fill out the proper forms or to fill them out improperly.*

■ Second, Congress intended to have money laundering be not only separate in that an additional punishment could be imposed, but also *distinct* in that money laundering is aimed at conduct that does not qualify as "specified unlawful activity." The intent of S. 2683, consistent with the comments made by certain Senators at the outset of the Money Laundering Legislation Hearing, was to craft a narrow statute directed at the "core of money laundering." Senate Comm. on the Judiciary, The Money Laundering Crimes Act of 1986, S.Rep. No. 99-433, 99th Cong., 2d Sess. at 10 (1986). The Senate Committee on the Judiciary rejected the Administration's broad new offenses of facilitation and receiving the proceeds of a crime. S. 2683 was not meant to be "a wish list of amendments to the criminal code." 132 Cong.Rec. 17,572 (1986) (Sen. Biden, upon introducing S. 2683).

The legislative history indicates that the intent of Congress was that money-making activity remain punishable only under the statute prohibiting it, but the criminal's options regarding spending such money be limited—Congress intended that criminals choke on the accumulated fruits of crime. The criminal cannot reinvest in crime, and he or she must reveal himself or herself to spend the money. As Senator Biden stated, in comments adopted by the Senate Report, "Money laundering is a crucial financial underpinning of organized crime and narcotics trafficking. *Without money laundering, drug traffickers would literally drown in cash." Id.* at 17,571-72; Senate Comm. on the Judiciary, The Money Laundering Crimes Act of 1986, S.Rep. No. 99-433, 99th Cong., 2d Sess. at 4 (1986) (emphasis added). The statute was not directed at crimes that generate money. Rather, it was directed at the three-fold gap in the existing law, which allowed criminals to hide and spend the fruits of their crime with relative impunity.

*Id.* While the intent to permit prosecution under parallel statutes, that is, statutes also directed at money laundering conduct, appears in Section 1956(d), the Court does not read that section as bearing upon the real question in this case—the relationship between Section 1956(a)(1)(A)(i) and "specified unlawful activity."

Congress in fact considered and rejected the Administration proposal that would have interjected the offense of money laundering into any other offense that employs or results in cash. Significantly, the legislative history is devoid of reference to an intent to tacitly amend the maximum sentences for "specified unlawful activity," which would result from interjecting the offense of money laundering into other offenses, like conducting an illegal gambling business, for which Congress provided lesser maximum sentences. Congress also considered and rejected the proposals to define money laundering to include all monetary transactions through financial institutions before, during or after a crime. In place of these proposals, Congress substituted a narrower statute that was not intended to be an alternative means of punishing already criminalized conduct, and used the requirement that a "financial transaction" must "in fact involve[ ] proceeds of specified unlawful activity" to ensure this result. Congress intended to maintain the "integrity" of the offenses listed as "specified unlawful activity" so that the activity constituting "specified unlawful activity" does not constitute, by itself, money laundering.

Applying these two conclusions to the money laundering object of the conspiracy count in this case is problematical. On the one hand, Congress included Section 1955, the prohibition of illegal gambling businesses, as a "specified unlawful activity" under Section 1956, and the intent of Congress is clear that multiple punishments for money laundering and the "specified unlawful activity" may be had. Any reconciliation of the scope of the two statutes, therefore, should allow some application of the money laundering statute. On the other hand, the joint, continuing offense of engaging in an illegal gambling business—the business being the allowable unit of prosecution—is very broad, and the intent of Congress is clear that activity constituting "specified unlawful activity" should not qualify, without more, as money laundering.

The crux of the money laundering object of the conspiracy count is that "during the period November 1986 through September 1991 cash proceeds from illegal gambling involving video poker machines was [sic] received, transferred, delivered, deposited or otherwise transacted by the defendants in violation of Title 18, United States Code, Section 1956." If this activity could not be properly charged as substantive money laundering, it cannot survive as a money laundering object of the conspiracy count.

The Government contends that this activity is money laundering because, once the money is placed in the video poker machine, any subsequent transaction among the members of the business constitutes both running an illegal gambling business and money laundering. Not only does the Government's interpretation fail to account for the fact that the illegal gambling *business* is the "specified unlawful activity," not the state law violations, it fails to account for Congress's intent to preserve the integrity of the "specified unlawful activity" offense and to punish as money laundering only the activity that was not otherwise subject to federal law. While this interpretation does not preserve the integrity of the illegal gambling business offense, it does result in the money laundering statute's having very broad application to an illegal gambling business. This broad application, however, is dependent upon the bizarre interpretation of the elements of Section 1956(a)(1)(A)(i) discussed *supra* p. 1138–40.

Defendant McGrath contends that a wide variety of transactions involving the money placed into the video poker machines is necessarily part of the illegal gambling business, including collecting and counting money, dividing up money, transferring and transporting money, depositing money into banks and withdrawing money from banks. McGrath further contends that this same conduct cannot be properly alleged to be money laundering. *See* McGrath's First Supplemental Brief in Support of Motion to Dismiss Count 1, at 9–10 (Document No. 628). McGrath's interpretation, however, affords Section 1956(a)(1)(A)(i) application to illegal gambling businesses only in unusual situations, for instance where gambling money finances drug sales or an illegal gambling business distinct and separate from the one acting as "specified unlawful activity" with respect to the requirement that the "financial transaction"

must "in fact involve[ ] the proceeds of specified unlawful activity." Any person who engaged in financial transactions in money known to be "proceeds" of some crime, intending to promote the carrying on of the illegal gambling business, *i.e.*, money laundering, would by that very act be conducting or financing an illegal gambling business.[31] McGrath's interpretation has the virtue of being consistent with Congress's intent, as manifested in the requirement that a "financial transaction" must "in fact involve[ ] the proceeds of specified unlawful activity," of preserving the integrity of the illegal gambling offense.

The Court, having considered all the materials at its disposal, including the language and structure of the money laundering statute, its legislative history, and its motivating policies, *see Bifulco v. United States*, 447 U.S. 381, 387, 100 S.Ct. 2247, 2252, 65 L.Ed.2d 205 (1980), concludes that the intent of Congress with respect to the applicability of Section 1956(a)(1)(A)(i) to conduct that also constitutes running an illegal gambling business is not clear. Although it is clear from the statute and the legislative history that Congress intended Section 1956(a)(1)(A)(i) to have *some* application with respect illegal gambling businesses, it is not clear whether, or how, Congress intended that activities constituting running an illegal gambling business be, without more, money laundering.[32]

**31.** Section 1956(a)(1)(B)(i) would continue to have wide application. Anyone "knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity," yet lacking the intent to conduct the illegal gambling business, could still be convicted of engaging in a financial transaction with the intent "to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity." Thus, Section 1956(a)(1)(B)(i) would continue to apply to "those transactions that can be said to constitute the core of money laundering." Senate Comm. on the Judiciary, The Money Laundering Crimes Act of 1986, S.Rep. 99–433, 99th Cong., 2d Sess. at 10 (1986). *Cf. supra* note 23 and accompanying text.

**32.** Between the positions staked out in this case, lines could be drawn that sacrifice, in varying degrees, the integrity of the illegal gambling offense in favor of the application of the Section 1956(a)(1)(A)(i), or vice versa. For instance, the rule could be that money laundering occurs whenever the cash deposited in the video poker machines emanates from the illegal gambling business in furtherance of the business. This rule would encompass what appears to be the primary focus of Section 1956(a)(1)(A)(i), the reinvesting of money from crime to continue or expand crime. Applying such a rule would entail prosecuting only the members of the illegal gambling business; the second party to the transaction would have to lack the intent to promote the carrying on of the illegal gambling business so as not to be a member of it. Such a rule would cover a variety of transactions with innocent banks, sellers, purchasers, etc.

Another possible rule delineating an overlap of money laundering under Section 1956(a)(1)(A)(i) and an illegal gambling business is one that focuses on the banking system. Such a rule could cover transactions between members of the gambling conspiracy outside of the bank and inside of the bank, as well as transactions between members and innocent bank employees. This rule would not cover transactions with others, inside or outside the gambling business. As Congress rejected the use of a financial institution as a defining element of the offense, which would have criminalized the use of financial institutions before, during, or after a crime, in favor of the requirement that the "financial transaction" must "in fact involve[ ] the proceeds of specified unlawful activity," this rule is problematical in view of the rule of lenity.

Yet another possible means of delineating an overlap of money laundering and an illegal gambling business is suggested by the Department of Justice "Bluesheet" highlighting the ambiguity of "proceeds" with respect to certain "specified unlawful activity". *See supra* pp. 1139–40. Discrete "phases" of an illegal gambling business could be defined. For instance, one "phase" could include the activities from the point of customer contact through the collection process. The collection process could be defined to include only transfers between members who, within the organization, have authority only to pass the funds up to the next rung on the organization's ladder. Once this "phase" is complete, the money collected would be "proceeds" and its use, within or without the illegal gambling business, would be both money laundering and engaging in an illegal gambling business. Defining "phases" of the illegal gambling business does not suggest a single rule; definitions other than the foregoing could be created.

The Court has also considered a rule distinguishing activities that are normal and ordinary incidents of running a gambling business from extraordinary activity. The Court concluded, however, that this approach provides an unworkable distinction due to the breadth of the illegal gambling statute.

As Congress intended both that Section 1956(a)(1)(A)(i) have some application with respect to an illegal gambling business and that the integrity of the "specified unlawful activity" of-

Because the intent of Congress to impose a punishment under Section 1956(a)(1)(A)(i) for acts already penalized under the illegal gambling statute is not clear, *cf. supra* p. 1134; *Hunter,* 459 U.S. at 366–67, 103 S.Ct. at 678, and because Defendant McGrath and the joining defendants are entitled to the benefit of the rule of lenity, *United States v. Enmons,* 410 U.S. 396, 411, 93 S.Ct. 1007, 1015, 35 L.Ed.2d 379 (1973); *United States v. Long,* 654 F.2d 911, 914 (3d Cir.1981), the Court holds that activities penalized under Section 1955, the Prohibition of Illegal Gambling Businesses, are not, without more, also punishable under Section 1956(a)(1)(A)(i). Section 1956(a)(1)(A)(i) will continue to apply in the context of an illegal gambling business where the "promoted" "specified unlawful activity" is other than the underlying illegal gambling business; and Section 1956(a)(1)(B)(i) will continue to apply to the core of money laundering. *See supra* note 31.

That Count One, the conspiracy count, does not charge Defendants with substantive money laundering cannot save the money laundering object of the conspiracy count. An agreement to engage in conduct that is not illegal under Section 1956 can no more be the basis of a conspiracy conviction than the conduct itself can be the basis of a substantive conviction. The money laundering object of the conspiracy count fails to state an offense under 18 U.S.C. § 371 and 18 U.S.C. § 1956(a)(1)(A)(i).

As will be shown in the following section, Count One contains within it the clear and fully articulated offense of conspiracy under 18 U.S.C. § 371 to operate an illegal gambling business in violation of 18 U.S.C. § 1955. The appropriate remedy is to strike with prejudice the money laundering object of the conspiracy, rather than dismissing all of Count One. *See United States v. Miller,* 471 U.S. 130, 144, 105 S.Ct. 1811, 1819, 85 L.Ed.2d 99 (1985).[33]

## DEFENDANT SHEILA SMITH'S MOTION TO DISMISS (DOCUMENT NO. 381) AND DEFENDANT JACK CONLEY'S OMNIBUS PRETRIAL MOTION: MOTION TO DISMISS COUNTS I AND II (DOCUMENT NO. 374, IN PART)

Sheila Smith raises several challenges relating to the illegal gambling business object of the conspiracy charge at Count One and the substantive illegal gambling charge at Count Two.[34] She contends that 18 Pa.Cons. Stat.Ann. § 5513 is unconstitutionally vague, both facially and as applied. Further, she contends that it is a regulatory provision, violation of which will not suffice as a predicate crime under Section 1955 or, directly or indirectly, under Section 1956(a)(1)(A)(i). Finally, both Sheila Smith and Jack Conley contend that the requisite specific intent element of 18 Pa.Cons.Stat.Ann. § 5513 is not alleged in the Indictment.

Where a state statute is challenged as being unconstitutionally vague and that

---

fenses be preserved, the Court's choosing one of the means of delineating some overlap between these two broad statutes would " 'be based on no more than a guess as to what Congress intended.' " *Bifulco v. United States,* 447 U.S. 381, 387, 100 S.Ct. 2247, 2252, 65 L.Ed.2d 205 (1980) (quoting *Ladner v. United States,* 358 U.S. 169, 178, 79 S.Ct. 209, 214, 3 L.Ed.2d 199 (1958)). Moreover, the Court would be hard pressed to peg one of these intermediate delineations to the statutory language actually employed by Congress.

**33.** Also pending before the Court are Defendant Abbott's Motion to Dismiss on the Grounds of Duplicitous Indictment or, in the Alternative, to Elect (Document No. 252) and Defendant McGrath's Motion to Dismiss or, in the Alternative, to Elect or to Force the Government to Divide Count I on the Grounds of Duplicitous

Indictment. (Document No. 389). These motions, in light of this opinion, will be denied as moot. Defendant McGrath's Motion to Dismiss Count I, which is the subject of this Opinion, raises further contentions, which are also mooted by this Memorandum Opinion.

**34.** Sheila Smith's Motion to Dismiss is also directed at the money laundering object of the conspiracy charge at Count One and the substantive money laundering charges at Counts 21 and 22. In view of the Court's foregoing disposition of McGrath's Motion to Dismiss and the Court's dismissal of Counts 21 and 22 for being duplicitous, *see United States v. Conley,* 826 F.Supp. 1536 (W.D.Pa.1993) (Document No. 712, Crim. No. 91–178) *and* Document No. 757, the Court will deny as moot Sheila Smith's challenges relating to money laundering.

statute has not been interpreted by state courts, a federal court is "'relegated ... to the words of the ordinance itself,' to interpretations the [state court] has given to analogous statutes, and, perhaps to some degree, to the interpretation of the statute given by those charged with enforcing it." *Grayned v. City of Rockford*, 408 U.S. 104, 110, 92 S.Ct. 2294, 2300, 33 L.Ed.2d 222 (1972). Where, however, state courts have interpreted the challenged statute, a federal court must assess the vagueness challenge in light of the state court's interpretation of the statute. The statute must be deemed to read exactly as it has been interpreted by the highest court of the State. *Kolender v. Lawson*, 461 U.S. 352, 355 & n. 4, 103 S.Ct. 1855, 1857 & n. 4, 75 L.Ed.2d 903 (1983).

■ Section 5513(a) of the Pennsylvania Crimes Code, which is set forth in full *supra* note 7, has been interpreted by Pennsylvania courts. This Court notes the two ways in which a person can use a video poker machine in violation of Section 5513(a)(1): by intentionally or knowingly making, assembling, setting up, maintaining, selling, lending, leasing or giving away (1) a devise that is a gambling devise *per se*, or (2) a devise intended to be used for gambling purposes. *See Commonwealth v. Twelve Dodge City Video Poker Mach.*, 517 Pa. 363, 365–67, 537 A.2d 812, 813–14 (1988); *Commonwealth v. Two Elec. Poker Game Mach.*, 502 Pa. 186, 191–92 & nn. 1 & 2, 197–98, 465 A.2d 973, 975–76 & nn. 1 & 2, 979 (1983);[35] *Commonwealth v. Bretz*, 289 Pa.Super. 259, 264 n. 5, 433 A.2d 55, 58 n. 5 (1981) (citing cases); *Commonwealth v. Rose*, 257 Pa.Super. 514, 516–17, 390 A.2d 1356, 1357 (1978).

The determination of whether a machine is a gambling device *per se* "will turn on the characteristics of the machine when read against the three elements necessary to gambling: consideration, a result determined by chance rather than skill, and a reward. If the machine displays all three qualities, it will then be 'so intrinsically connected with gambling' as to be a gambling device *per se.*" *Two Elec. Poker Game Mach.*, 502 Pa. at 194, 465 A.2d at 977.

■ The Pennsylvania Supreme Court has determined that video poker machines meet the consideration and chance elements. 502 Pa. at 194–196, 465 A.2d at 977–78. Nonetheless, absent a "knock down" button, which removes accumulated credits, and a meter, which records the number of credits knocked down, the element of reward is lacking, and the machine does not qualify as a gambling device *per se.* 502 Pa. at 197–98, 465 A.2d at 979. That a machine is readily converted, by the addition of a knock down button and meter, to a gambling device *per se* does not make the machine a gambling device *per se. Twelve Dodge City Video Poker Mach.*, 517 Pa. at 367, 537 A.2d at 814.

■ Section 5513(a)(1) can be the basis of a criminal conviction only if a strict requirement of specific intent is met. The Superior Court of Pennsylvania has stated:

To prove a criminal violation of this section of the crimes code, the Commonwealth must prove beyond a reasonable doubt the accused specifically intended to use the device for gambling purposes or it actually was so used [sic] *Commonwealth v. Forry*, 201 Pa.Super. 431, 193 A.2d 761 (1963). It is not sufficient to show the defendant possessed a gambling device per se absent proof of specific intent to use it for gambling purposes. *Commonwealth v. Bretz*, 289 Pa.Super. 259, 433 A.2d 55 (1981); *Commonwealth v. Rose*, 257 Pa.Super. 514, 390 A.2d 1356 (1978).

*Commonwealth v. Dumont*, 370 Pa.Super. 155, 169–70, 536 A.2d 342, 349 (1987), *alloc. denied*, 519 Pa. 659, 546 A.2d 620 (1988). Thus, even where a per se gambling device is involved, the Commonwealth must prove that the per se gambling device was specifically

---

**35.** These Pennsylvania Supreme Court cases apply 18 Pa.Cons.Stat.Ann. § 5513(b), which provides:

(b) Confiscation of gambling devices.—Any gambling device possessed or used in violation of the provisions of subsection (a) of this section shall be seized and forfeited to the Commonwealth. All provisions of law relating to the seizure, summary and judicial forfeiture, and condemnation of intoxicating liquor shall apply to seizures and forfeitures under the provisions of this section.

18 Pa.Cons.Stat.Ann. § 5513(b) (Purdon 1983).

intended to be used for the purposes of illegal gambling.

The Supreme Court of the United States has explained the vagueness doctrine as follows:

> As generally stated, the void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary enforcement.... Although the doctrine focuses both on actual notice to citizens and arbitrary enforcement, we have recognized recently that the more important aspect of the vagueness doctrine "is not actual notice, but the other principal element of the doctrine—the requirement that a legislature establish minimal guidelines to govern law enforcement."

*Kolender*, 461 U.S. at 358, 103 S.Ct. at 1858 (citations omitted). The vagueness of a law may be mitigated by a scienter requirement. *Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 499, 102 S.Ct. 1186, 1193, 71 L.Ed.2d 362 (1982). A law that validly and clearly applies to the conduct of the person raising the vagueness challenge is not unconstitutionally vague, either facially or as applied. *Id.* at 494–95 & n. 7, 102 S.Ct. at 1191 & n. 7.

As interpreted by Pennsylvania courts, Section 5513 is not unconstitutionally vague in view of the conduct alleged in the indictment in this case. As applied to video poker machines *qua* illegal per se gambling devices, Section 5513 is crystal-clear: the machines must be equipped with "knock off switches" and "meters." To the extent that the conduct reflected in the Indictment implicates the per se illegality of the video poker machines, *see* Indictment, at 10, ¶ 25 (Document No. 1), Section 5513 is not unconstitutionally vague. The strict intent requirements of Section 5513, which apply equally in the criminal context to illegal per se gambling devices and misused, legitimate amusement devices, sufficiently limit prosecutorial discretion in defining the offense and give notice of the proscribed conduct. The intent requirement provides the "rational and predictable boundary" that Defendant Smith contends is lacking in Section 5513: making, assembling, setting up, maintaining, selling, lending, leasing or giving away checkers boards, dart games, walnut shells, video poker machines or any other devices is criminal under Section 5513 *if the act is done with the intent that the subject items be used for gambling purposes.*[36]

Defendant Smith contends that, if *Commonwealth v. Twelve Dodge City Video Poker Mach.*, 517 Pa. 363, 365–67, 537 A.2d 812, 813–14 (1988) and *Commonwealth v. Two Elec. Poker Game Mach.*, 502 Pa. 186, 191–92 & nn. 1 & 2, 197–98, 465 A.2d 973, 975–76 & nn. 1 & 2, 979 (1983), which interpreted Section 5513(b), are relied upon to give adequate definiteness to Section 5513(a), Section 5513(a) becomes a regulatory provision rather than a criminal statute. The Court rejects this interpretation for two reasons.

First, Section 5513 is found in the Pennsylvania Criminal Code and is defined there as a first degree misdemeanor. The General Assembly of the Commonwealth defined Section 5513(a) as a crime, not a regulatory provision.

Second, under *Dumont*, actual intent to use, or actual use of, the video poker machine as a means of gambling is required for criminal conviction. That illegal per se machines are forfeitable contraband under Section 5513(b) without evidence of such intent or use is of no avail to Defendant Sheila Smith. Even were the pronouncements of the Supreme Court of Pennsylvania authoritative interpretations of Section 5513(a)(1) only in the context of civil forfeitures—a doubtful proposition—the statute, interpreted to require specific intent, is sufficiently definite to pass constitutional muster irrespective of the Supreme Court's pronouncements regarding

---

**36.** Defendant Smith's challenge to the definiteness of Section 5513 focuses on 5513(a)(1). In contrast, the Government frames its argument in terms of Section 5513(a) as a whole, pointing to the intent requirements found in 5513(a)(3) & (4), as well as 5513(a)(1). The Court reads the statute and state precedent as clearly requiring specific intent as to any criminal violation of Section 5513(a).

forfeitures. It is the standard of intent set forth in *Dumont* that assures that Section 5513(a) is not vague, not the concept of illegal *per se* video poker machines.[37]

Defendants Sheila Smith and Jack Conley both contend that the Indictment fails to allege any violation of Section 5513 with adequate specificity. In particular, the Indictment is challenged because it fails to set forth any allegation of specific intent on the part of any defendant or of sale, lease or maintenance of per se illegal devices.

As the Government tacitly concedes, the Indictment is devoid of such allegations and fails to allege with specificity facts stating an offense under Section 5513 of the Pennsylvania Crimes Code. The Government invokes Section 5513 of Pennsylvania Crimes Code merely as a predicate to its illegal gambling business charges under Section 1955 and, in turn, invokes Section 1955 as a predicate to its money laundering charge under Section 1956. Government's Second Omnibus Response to Defendants' Pretrial Motions, at 25 & n. 1 (Document No. 666). The Government has disavowed any *direct* reliance upon Section 5513(a) of the Pennsylvania Crimes Code as "specified unlawful activity" under Section 1956 of the federal crimes code; Section 5513(a) is relevant to Section 1956 only *indirectly* through Section 1955(b). Government's Second Omnibus Response to Defendants' Pretrial Motions, at 25–27 (Document No. 666).

With respect to an illegal gambling business under Section 1955, the requirement that the gambling business be in violation of local law is a "jurisdictional element which need only be proved with respect to the business." *Sanabria*, 437 U.S. at 68 n. 22, 98 S.Ct. at 2181 n. 22; *id.* at 70, 98 S.Ct. at 2182 ("The Government need not prove that the defendant himself performed any act of gambling prohibited by state law. It is participation in the gambling business that is a federal offense, and it is only the gambling business that must violate state law"); *Unit-*

*ed States v. Balistrieri*, 779 F.2d 1191, 1224 (7th Cir.1985) ("As long as the twelve jurors all found that the gambling business that [the defendant] was charged with conducting violated Wisconsin law, they were unanimous on that material element of the crime, even if they differed among themselves as to which precise provision of Wisconsin law it violated"), *cert. denied*, 475 U.S. 1095, 106 S.Ct. 1490, 89 L.Ed.2d 892 (1986). The Third Circuit has recently reviewed the specificity required of an indictment, stating:

> An indictment is sufficient if it includes the elements of the offense intended to be charged, apprises the defendant of what he or she must be prepared to meet at trial, and enables the defendant to show with accuracy to what extent he or she may plead an acquittal or conviction as a bar to subsequent prosecution. *Russell v. United States*, 369 U.S. 749, 763–64, 82 S.Ct. 1038, 1047, 8 L.Ed.2d 240 (1962); *United States v. Rankin*, 870 F.2d 109, 112 (3d Cir.1989). Generally, an indictment may track the language of the statute, as long as "those words of themselves fully, directly, and expressly, without any uncertainty or ambiguity, set forth all the elements necessary to constitute the offense intended to be punished." *Hamling v. United States*, 418 U.S. 87, 117, 94 S.Ct. 2887, 2907, 41 L.Ed.2d 590 (1974) (quoting *United States v. Carll*, 105 U.S. 611, 26 L.Ed. 1135 (1882)). We have stated that "no greater specificity than the statutory language is required so long as there is sufficient factual orientation to permit the defendant to prepare his defense and to invoke double jeopardy in the event of a subsequent prosecution." *United States v. Olatunji*, 872 F.2d 1161, 1166 (3d Cir.1989) (quoting *Rankin*, 870 F.2d at 112).

*United States v. Shirk*, 981 F.2d 1382, 1389 (3d Cir.1993), *petition for cert. filed*, 61 U.S.L.W. 3805 (May 17, 1993). In view of these authorities, the Government's contention is correct—the Indictment's failure to fully and clearly allege specific intent on the

---

**37.** Illegality per se of a video poker machine does not establish the specific intent requirement under Section 5513. The knock off button and the meter, however, remain highly probative of intent. For instance, specific intent beyond a

reasonable doubt was found from the presence of meters and knock off buttons and the use of these features as reflected in the data contained in the meter functions. *Dumont*, 370 Pa.Super. at 170, 536 A.2d at 349–50.

part of the defendants and the other elements of a violation of Section 5513 of the Pennsylvania Crimes Code is irrelevant. As the requirement that the gambling business be in violation of local law is merely a jurisdictional element, the indictment need not allege with specificity the elements of the state law violation.[38]

Defendants Jack Conley and Sheila Smith have advanced no valid challenge to the illegal gambling business charges in Counts One and Two of the Indictment. To the extent that their motions have not been mooted previously, the motions will be denied.

An appropriate order will be entered.

### ORDER OF COURT

AND NOW, this 3rd day of September, 1993, upon consideration of the Court's Memorandum Opinion of even date, it is hereby ORDERED as follows:

(1) The motions to join in Defendant Thomas "Bud" McGrath's Motion to Dismiss Count I (Document No. 388) filed by Defendants Duffy Conley (Document No. 421, in part), Curtin (Document No. 423, in part), Sheila Smith (Document No. 434, in part), Jack Conley (Document No. 418, in part), Abbott (Document No. 429, in part), Joanne Smith (Document No. 408, in part), Goodwin (Document No. 424, in part), Demino (Document No. 428, in part), Ciocco (Document No. 433, in part), Sukaly (Document No. 430, in part), Ferrell (Document No. 432, in part), Rodites (Document No. 431, in part) and Rusin (Document No. 704, in part) are GRANTED;

(2) Defendant Thomas "Bud" McGrath's Motion to Dismiss Count I (Document No. 388) is GRANTED as follows:

The money laundering object of the conspiracy alleged in Count One of the Indictment at paragraph 21(b) is STRICKEN WITH PREJUDICE;

(3) Defendant Thomas "Bud" McGrath's Motion to Dismiss or, in the Alternative, to Elect or Force the Government to Divide Count I on the Grounds of Duplicitous Indictment (Document No. 389), and the motions to join therein filed by Defendants Curtin (Document No. 423, in part), Sheila Smith (Document No. 434, in part), Jack Conley (Document No. 418, in part), Abbott (Document No. 429, in part), Joanne Smith (Document No. 408, in part), Goodwin (Document No. 424, in part), Demino (Document No. 428, in part), Ciocco (Document No. 433, in part), Sukaly (Document No. 430, in part), Ferrell (Document No. 432, in part), Rodites (Document No. 431, in part) and Rusin (Document No. 704, in part), are DENIED AS MOOT;

(4) Defendant Mark A. Abbott's Motion to Dismiss on the Grounds of Duplicitous Indictment or, in the Alternative, to Elect (Document No. 252), and the motions to join therein filed by Defendants Curtin (Document No. 423, in part), Jack Conley (Document No. 418, in part), Joanne Smith (Document No. 408, in part), Goodwin (Document No. 424, in part), Demino (Document No. 428, in part), Ciocco (Document No. 433, in part), Sukaly (Document No. 430, in part), Ferrell (Document No. 432, in part), Rodites (Document No. 431, in part) and Rusin (Document No. 704, in part), are DENIED AS MOOT;

(5) The motions to join in Defendant Sheila F. Smith's Motion to Dismiss (Document No. 381) filed by Defendants Duffy Conley (Document No. 421, in part), Curtin (Document No. 423, in part), Jack Conley (Document No. 418, in part), McGrath (Document No. 417, in part), Abbott (Document No. 429, in part), Rossi (Document No. 438, in part), Joanne Smith (Document No. 408, in part), Goodwin (Document No. 424, in part), Demino (Document No. 428, in part), Ciocco (Document No. 433, in part), Sukaly (Document No. 430, in part), Ferrell (Document No. 432, in part), Rodites (Document No. 431, in part) and Rusin (Document No. 414, in part) are GRANTED;

(6) Defendant Sheila F. Smith's Motion to Dismiss (Document No. 381) is DE-

---

38. Because the Government does not contend that Section 5513(a) is "specified unlawful activity" and because the illegal gambling business is the subject of its own substantive count, the Court need not address the pleading requirements with respect to the elements of "specified unlawful activity."

NIED AS MOOT IN PART and DENIED IN PART as follows:

(a) To the extent that it relates to the money laundering object of the conspiracy charge at Count One and the substantive money laundering charges at Counts Twenty–One and Twenty–Two, the motion is DENIED AS MOOT; and

(b) To the extent that it relates to the illegal gambling business object of the conspiracy charge at Count One and the substantive illegal gambling business charge at Count Two, the motion is DENIED;

(7) The motions to join in Defendant John Francis "Jack" Conley's Omnibus Pretrial Motion: Motion to Dismiss (Document No. 374, in part) filed by Defendants Duffy Conley (Document No. 421, in part), Curtin (Document No. 423, in part), Abbott (Document No. 429, in part), Rossi (Document No. 438, in part), Joanne Smith (Document No. 408, in part), Goodwin (Document No. 424, in part), Demino (Document No. 428, in part), Garofalo (Document No. 412, in part), Ciocco (Document No. 433, in part), Sukaly (Document No. 430, in part), Ferrell (Document No. 432, in part), Rodites (Document No. 419, in part) and Rusin (Document No. 414, in part) are GRANTED;

(8) Defendant John Francis "Jack" Conley's Omnibus Pretrial Motion: Motion to Dismiss (Document No. 374, in part) is DENIED.

(9) The motions to join referenced in ¶¶ 1, 3, 4, 5 & 7 of this Order shall remain pending to the extent not expressly ruled upon in this Order.